731 F.2d 909
 78 A.L.R.Fed. 751, 235 U.S.App.D.C. 207,
1984-1 Trade Cases 65,885
 LAKER AIRWAYS LIMITED, a Foreign Corporation
v.
SABENA, BELGIAN WORLD AIRLINES, a Foreign Corporation
KLM, Royal Dutch Airlines, a Foreign Corporation, Appellant.
LAKER AIRWAYS LIMITED, a Foreign Corporation
v.
SABENA, BELGIAN WORLD AIRLINES, a Foreign Corporation, Appellant,
KLM, Royal Dutch Airlines, a Foreign Corporation.
 Nos. 83-1280, 83-1281.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 14 Nov. 1983.
Decided 6 March 1984.
As Amended March 6 and 9, 1984.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 83-0416).
 Peter J. Nickles, Washington, D.C., with whom Eugene D. Gulland and William P. Skinner, Washington, D.C., were on brief, for appellant Sabena in No. 83-1281.
 Thomas J. Whalen, New York City, with whom Stephen J. Fearon and Lawrence Mentz, New York City, were on brief, for appellant KLM in No. 83-1280.
 Carl W. Schwarz, Washington, D.C., with whom Robert M. Beckman and Wesley K. Caine, Washington, D.C., were on brief, for appellee in Nos. 83-1280 and 83-1281.
 Lloyd N. Cutler, James S. Campbell, Gary D. Wilson, Andrew N. Vollmer, William R. Richardson, Jr., Terrence J. Leahy, Laurance A. Short, William Karas and David H. Coburn, Washington, D.C., were on brief, for amicus curiae, Deutche Lufthansa Atkiengesellschaft, et al., urging that the preliminary injunction be vacated in Nos. 83-1280 and 83-1281.
 Before WILKEY and STARR, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the Court filed by Circuit Judge WILKEY.
 Dissenting Opinion filed by Circuit Judge STARR.
 OUTLINE OF OPINION FOR THE COURT
 Page
Introduction .............................................. 914
 I. BACKGROUND ........................................... 916
 A. Laker's Antitrust Claims .......................... 916
 B. Litigation History ................................ 917
 C. Current Appeals in this Court ..................... 920
 II. ANALYSIS ............................................ 921
 A. Bases of Concurrent Prescriptive Jurisdiction:
 Territoriality and Nationality .................... 921
 1. Overview ....................................... 921
 2. United States Jurisdictional Base .............. 922
 a. Territorial Contacts Justifying
 Application of United States
 Antitrust Law ............................... 923
 b. Adequacy of United States
 Territorial Interests ....................... 925
 3. British Jurisdictional Base .................... 926
 4. Concurrent Jurisdiction ........................ 926
 B. Propriety of the Antisuit Injunction .............. 926
 1. Protection of Jurisdiction ..................... 927
 2. Evasion of Important Public Policies ........... 931
 3. Effect of the English Injunctions .............. 933
 C. Paramount Nationality ............................. 934
 D. International Comity .............................. 937
 E. Judicial Reconciliation of Conflicting
 Assertions of Jurisdiction ....................... 945
 1. Nature of the Conflict ......................... 945
 2. Judicial Interest Balancing .................... 948
 a. Defects in the Balancing Process ............ 948
 b. Promotion of International Comity ........... 950
 3. Political Compromise ........................... 953
 III. CONCLUSION ......................................... 955
 WILKEY, Circuit Judge:
 
 
 1
 We review today the limits of a federal court's power to conserve its adjudicatory authority over a case properly filed with the court when, instead of actively raising all defensive claims in the federal court, the named defendants initiate suits in foreign tribunals for the sole purpose of terminating the federal court's adjudication of the litigation. Three months after Laker Airways, Ltd. ("Laker") filed an antitrust action in United States District Court for the District of Columbia against several defendants, including domestic, British, and other foreign airlines, the foreign airlines filed suits in the High Court of Justice of the United Kingdom seeking an injunction forbidding Laker from prosecuting its American antitrust action against the foreign defendants. After the High Court of Justice entered interim injunctions against Laker, the Court of Appeal issued a permanent injunction ordering Laker to take action to dismiss its suit against the British airlines. In the meantime, Laker responded by requesting injunctive relief in the United States District Court, arguing that a restraining order was necessary to prevent the remaining American defendants and the additional foreign defendants Laker had named in a subsequent antitrust claim from duplicating the foreign defendants' successful request for an English injunction compelling Laker to dismiss its suit against the defendants.
 
 
 2
 If these defendants had been permitted to file foreign injunctive actions, the United States District Court would have been effectively stripped of control over the claims--based on United States law--which it was in the process of adjudicating. Faced with no alternative but acquiescence in the termination of this jurisdiction by a foreign court's order, United States District Judge Harold H. Greene granted Laker's motion for a preliminary injunction restraining the remaining defendants from taking part in the foreign action designed to prevent the district court from hearing Laker's antitrust claims.
 
 
 3
 Two of the defendants enjoined from taking part in the English proceeding, KLM Royal Dutch Airlines ("KLM") and Societe Anonyme Belge d'Exploitation de la Navigation Aerienne ("Sabena") now contend on appeal that the court abused its discretion. Their arguments are essentially two-fold: first, that the injunction tramples Britain's rights to regulate the access of its nationals to judicial remedies; second, that the injunction contravenes the principles of international comity which ordinarily compel deference to foreign judgments and which virtually always proscribe any interference with foreign judicial proceedings.
 
 
 4
 Our review of the limited available facts strongly suggests that both the United States and Great Britain share concurrent prescriptive jurisdiction over the transactions giving rise to Laker's claim. Ordinarily antisuit injunctions are not properly invoked to preempt parallel proceedings on the same in personam claim in foreign tribunals. However, KLM and Sabena do not qualify under this general rule because the foreign action they seek to join is interdictory and not parallel. It was instituted by the foreign defendants for the sole purpose of terminating the United States claim. The only conceivable benefit that KLM and Sabena would reap if the district court's injunction were overturned would be the right to attack the pending United States action in a foreign court. This would permit the appellants to avoid potential liability under the United States laws to which their business operations and treaty obligations have long subjected them. In these circumstances there is ample precedent justifying the defensive use of an antisuit injunction.
 
 
 5
 The injunction does not transgress either the principles of international comity or nationality-based prescriptive jurisdiction on which KLM and Sabena rely. Limitations on the application of comity dating from the origins of the doctrine recognize that a domestic forum is not compelled to acquiesce in pre- or postjudgment conduct by litigants which frustrates the significant policies of the domestic forum. Accession to a demand for comity predicated on the coercive effects of a foreign judgment usurping legitimately concurrent prescriptive jurisdiction is unlikely to foster the processes of accommodation and cooperation which form the basis for a genuine system of international comity. Similarly, the mere fact of Laker's British juridical status simply does not erase all other legitimate bases of concurrent jurisdiction, as appellants suggest. Thus, the appellants' arguments that the district court abused its discretion fall well short of their mark.
 
 
 6
 The claims raised by KLM and Sabena do pose serious issues regarding the Judiciary's role in accommodating the conflicting implementation of concurrent prescriptive jurisdiction. We have necessarily inquired into the source of the conflict facing the courts of the United States and United Kingdom, and probed the extent to which the judicial processes may effectively be employed to resolve conflicts like the present one. Given the inherent limitations on the Judiciary's ability to adjust national priorities in light of directly contradictory foreign policies, there is little the Judiciary may do directly to resolve the conflict. Although the flash point of the controversy has been the antisuit injunctions, the real powder keg is the strongly mandated legislative policies which each national court is bound to implement. Thus, it is unlikely that the underlying controversy would be defused regardless of the action we take today.
 
 
 7
 Because the principles of comity and concurrent jurisdiction clearly authorize the use of a defensive preliminary injunction designed to permit the United States claim to go forward free of foreign interference, we affirm the decision of the district court.
 
 I. BACKGROUND
 
 8
 This case raises especially troublesome issues on two different fronts. It represents a head-on collision between the diametrically opposed antitrust policies of the United States and United Kingdom, and is perhaps the most pronounced example in recent years of the problems raised by the concurrent jurisdiction held by several states over transactions substantially affecting several states' interests. These problems are all the more intractable because of the vehicles involved in the collision: antisuit injunctions designed to preempt the parties' access to the courts of foreign jurisdictions. The intersection of these issues confronts us with the Herculean task of accommodating conflicting, mutually inconsistent national regulatory policies while minimizing the amount of interference with the judicial processes of other nations that our courts will permit. Resolution of this appeal thus requires a clear grasp of both the underlying factual background of Laker's antitrust claims and the complex sequence of litigation and counterlitigation in which those claims have been asserted by Laker and attacked by the foreign defendants.
 
 A. Laker's Antitrust Claims
 
 9
 Accepting the veracity of Laker's allegations for the purposes of this appeal only,[1] we learn that Laker Airways, Ltd. was founded as a charter airline in 1966. It began charter operations between the United States and United Kingdom in 1970. As early as 1971 it sought to branch out into scheduled transatlantic air service. Laker hoped to gain a sizeable share of the transatlantic market by offering only basic air passage with little or no in-flight amenities and non-essential services. Flying at a reduced cost would enable Laker to set rates much lower than those then charged by existing transatlantic air carriers.
 
 
 10
 Laker's potential competitors allegedly resisted the entry of this new carrier, delaying the commencement of Laker's novel economy service for several years. However, by 1977 Laker obtained the necessary authorizations from the United States and British governments and inaugurated its low cost transatlantic airline service between London and New York.
 
 
 11
 The prices for scheduled transatlantic air service are substantially controlled by the International Air Transport Association ("IATA"), a trade organization of the world's largest air carriers. The IATA meets annually to establish fixed fares for air carriage, which are implemented after authorization by national governments of the individual carriers. Laker's fares were approximately one-third of the competing fares offered by other transatlantic carriers which were predominantly set under the auspices of the IATA. The airline members of IATA allegedly perceived Laker's operations as a threat to their system of cartelized prices. The new competition not only jeopardized the established markets of those carriers operating between the United Kingdom and the United States--such as British Airways and British Caledonian Airways--but also affected the demand for services provided by airlines flying direct routes between points in Continental Europe and the United States--such as Swiss Air Transport ("Swissair"), Lufthansa German Airlines ("Lufthansa"), KLM, and Sabena--since some passengers allegedly found it cheaper to fly through London on Laker Airways, rather than direct on the other European transatlantic carriers. During meetings of the IATA in July and August 1977 the IATA airlines allegedly agreed to set rates at a predatory level to drive Laker out of business.
 
 
 12
 Notwithstanding this asserted predatory scheme, up until 1981 Laker managed to operate at a profit. At its zenith, Laker was carrying one out of every seven scheduled air passengers between the United States and England.
 
 
 13
 However, during 1981 Laker's financial condition rapidly deteriorated. In mid 1981 the pound sterling declined precipitously. A large segment of Laker's revenues was in pounds, but most of its debts, such as those on its United States financed fleet of DC-10 aircraft, and expenses were in dollars. Already weakened by the asserted predatory pricing scheme, Laker ran into repayment difficulties. Fearing financial collapse, it sought to have its repayment obligations refinanced.
 
 
 14
 At this point several airlines allegedly conspired to set even lower predatory prices. In October 1981 Pan American Airlines, Trans World Airlines, and British Airways dropped their fares for their full service flights to equal those charged by Laker for its no-frills service. They also allegedly paid high secret commissions to travel agents to divert potential customers from Laker. These activities further restricted Laker's income, exacerbating its perilous economic condition. At IATA meetings in December 1981 at Geneva, Switzerland, and in January 1982 at Hollywood, Florida, the IATA airlines allegedly laid plans to fix higher fares in the spring and summer of 1982 after Laker had been driven out of business.
 
 
 15
 IATA members also interfered with Laker's attempt to reschedule its financial obligations. After Laker arranged a refinancing agreement, KLM, Sabena, and other IATA airlines allegedly pressured Laker's lenders to withhold the financing which had previously been promised. As a result of these alleged conspiracies, Laker was forced into liquidation under Jersey law in early February 1982.
 
 B. Litigation History
 
 16
 In the aftermath of these asserted conspiracies, Laker, through its liquidator, commenced an action in United States District Court for the District of Columbia to recover for the injuries sustained by the airline as a result of the alleged predatory pricing and unlawful interference with its refinancing arrangements. Laker's complaint filed on 24 November 1982, Civil Action No. 82-3362, alleged two counts: (1) violation of United States antitrust laws, and (2) a common law intentional tort. Named as defendants were four American corporations, Pan American World Airways, Trans World Airlines, McDonnell Douglas Corp., and McDonnell Douglas Finance Corp., as well as four foreign airlines, British Airways, British Caledonian Airways, Lufthansa, and Swissair.
 
 
 17
 Fearing that Laker would commence a second antitrust action against it, Midland Bank, a British corporation involved in Laker's abortive refinancing attempt, filed a preemptive action in the United Kingdom's High Court of Justice on 29 November 1982 seeking to enjoin Laker from naming it as a defendant in any United States antitrust action. An ex parte injunction was issued the same day; this became a more permanent preliminary injunction on 4 February 1983.
 
 
 18
 Shortly thereafter the four foreign defendants in No. 82-3362 initiated a similar suit in the High Court of Justice. Their writs filed on 21 January 1983 sought (1) a declaration that the four foreign defendants were not engaged in any unlawful combination or conspiracy, and (2) an injunction prohibiting Laker from taking any action in United States courts to redress an alleged violation by the defendants of United States antitrust laws. The writs specifically sought to compel Laker to dismiss its suit against the foreign defendants in No. 82-3362 and to prohibit Laker from instituting any other proceedings in any non-English forum to redress any alleged violation of English or other laws prohibiting intentional or unlawful commercial injury.[2]
 
 
 19
 The substantive basis for the requested relief was the alleged inapplicability of United States antitrust laws under the Bermuda II Treaty[3] and the British Protection of Trading Interests Act.[4] Shortly thereafter Justice Parker issued an interlocutory injunction preventing Laker from taking any action in the United States courts or elsewhere to interfere with the proceedings the defendants were commencing in the High Court of Justice.
 
 
 20
 On 24 January 1983, to avoid being enjoined from continuing to sue the four United States defendants, Laker sought a temporary restraining order from the United States District Court preventing the American defendants from instituting similar preemptive proceedings in England. The order was granted the same day, and later extended pending a hearing on Laker's motion for a preliminary injunction.
 
 
 21
 Approximately three weeks later, on 15 February 1983, Laker commenced in the district court a second antitrust suit, Civil Action No. 83-0416. Appellants KLM and Sabena were named as defendants. A temporary restraining order was also entered against the appellants, preventing them from taking any action in a foreign court that would have impaired the district court's jurisdiction. This order was extended pending a hearing on Laker's motion for a preliminary injunction.
 
 
 22
 On 2 March 1983, the British defendants in No. 82-3362 successfully petitioned Justice Parker of the High Court of Justice to grant a second interim injunction against Laker preventing Laker from taking "any further steps" to prosecute its United States claim against the British airlines. Although the injunction was only designed to preserve the status quo pending a ruling by the High Court of Justice on the merits of the British airlines' suit seeking dismissal of No. 82-3362, the injunction prevented Laker from filing any discovery or other motions against British Airways and British Caledonian.
 
 
 23
 At a hearing held five days later, Laker's motion for a preliminary injunction against the four American defendants, KLM, and Sabena was considered by the United States District Court. By order[5] of 7 March 1983 and memorandum opinion[6] dated 9 March 1983, the district court granted a preliminary injunction. The terms of the injunction were designed only to "protect the jurisdiction of [the district court] over these proceedings" to the extent necessary to preserve "the rights of the plaintiff under the laws of the United States." The injunction prevented the defendants from taking any action before a foreign court or governmental authority that would interfere with the district court's jurisdiction over the matters alleged in the complaint.[7] In its memorandum opinion, the court made it clear that it would consider further narrowing the terms of the injunction at the request of any party as long as it would not leave the defendants "free to secure orders which would interfere with the litigation pending" before the district court.[8] The court also consolidated Laker's two antitrust actions, No. 82-3362 and No. 83-0416.
 
 
 24
 KLM Royal Dutch Airlines and Sabena Belgian World Airlines, joined by amici curiae Swissair and Lufthansa, now appeal the 7 March 1983 order and 9 March 1983 memorandum of the district court which enjoined KLM and Sabena from seeking an injunction against Laker's antitrust suit in the English courts. However, during the pendency of this appeal, the process of litigation and counterlitigation has continued in the United States and English courts.
 
 
 25
 On 29 March 1983, Justice Parker vacated his 2 March 1983 injunction against Laker's prosecution of its antitrust suit against the foreign defendants in No. 83-3362. This interim injunction was then reinstated pending appeal.
 
 
 26
 In April and May 1983 Laker continued its efforts to proceed in its United States antitrust actions while defending itself against the proceedings in the High Court of Justice which were designed to terminate its United States claims. On 26 April 1983 Laker issued a summons in the High Court of Justice seeking a dismissal or stay of the suits initiated by Lufthansa and Swissair. Laker also moved in the High Court of Justice for a discharge of the injunction granted on 21 January 1983. In a motion for partial summary judgment filed in the United States District Court, Laker affirmatively challenged the defendants' contentions that the action should be dismissed on forum non conveniens grounds. By an opinion and order dated 3 May 1983 the district court granted Laker's motion and held that the principles of forum non conveniens did not require that jurisdiction be relinquished.[9]
 
 
 27
 In a judgment read by Justice Parker on 20 May 1983, the High Court of Justice held that the injunctive relief requested by the British airlines was not justified and terminated claims for relief filed by British Caledonian and British Airways.[10] Justice Parker held that the application of American antitrust laws to companies carrying on business in the United States was not contrary to British sovereignty or the terms of the Bermuda II Treaty, at least while the dormant terms of the British Protection of Trading Interests Act had not been invoked. The judgment did recognize that a determination by the English Secretary of State that Britain's trading interests were negatively implicated by the United States antitrust action could change the result.[11] However, at this point, before any intervention by the British Executive, the British court was willing to hold that Laker could not be prohibited from proceeding with its antitrust claims against British Airways and British Caledonian. The original interim injunctions were maintained pending an appeal to the Court of Appeal by British Airways and British Caledonian.
 
 
 28
 The complexion of the controversy changed dramatically the next month when the British Government invoked the provisions of the British Protection of Trading Interests Act ("Act").[12] Upon a determination that measures taken to regulate international trade outside the United Kingdom "threaten to damage the trading interests of the United Kingdom," the Act authorizes the English Secretary of State to require that any person conducting business in the United Kingdom disobey all foreign orders and cease all compliance with the foreign judicial or regulatory provisions designated by the Secretary of State. The Act authorizes the Secretary of State to prevent United Kingdom courts from complying with requests for document production issued by foreign tribunals, and forbids enforcement of treble damage awards or antitrust judgments specified by the Secretary of State.[13] On 27 June 1983 the Secretary of State for Trade and Industry cited his powers under the Act and issued an order and general directions prohibiting persons who carry on business in the United Kingdom, with the exception of American air carriers designated under the Bermuda II Treaty, from complying with "United States antitrust measures" in the district court arising out of any (1) "agreement or arrangement (whether legally enforceable or not) to which a UK designated airline is a party," or (2) "any act done by a UK designated airline" that relates to the provision of air carriage under the Bermuda II Treaty.[14]
 
 
 29
 Laker applied for judicial review of the validity of the order and directions. The Court of Appeal considered this application with the appeals by British Airways and British Caledonian of Justice Parker's judgment of 20 May 1983.
 
 
 30
 On 26 July 1983 the Court of Appeal announced its judgment that the order and directions were well within the power of the Secretary of State to issue, and hence valid. Because the order and directions of the British Executive prevented the British airline from complying with any requirements imposed by the United States District Court and prohibited the airlines from relying on their own commercial documents located within the United Kingdom to defend themselves against Laker's charges, the Court of Appeal concluded that the United States District Court action was "wholly untriable" and could only result in a "total denial of justice to" the British airlines.[15] As a result, the Court of Appeal held that Laker must be permanently enjoined from proceeding with its United States antitrust claims against British Airways and British Caledonian.
 
 
 31
 After a hearing following judgment, the Court of Appeal granted an injunction (1) restraining Laker from taking any steps against British Airways and British Caledonian in the United States action, and (2) directing Laker to use its best efforts to have British Airways and British Caledonian dismissed from the United States action. The second aspect of the injunction was stayed pending appeal to the House of Lords.[16] Subsequently, on 21 October 1983 Laker's summons to dismiss or stay the Lufthansa and Swissair action issued on 26 April 1983 was also adjourned pending the outcome of Laker's appeal.[17]
 
 C. Current Appeal in this Court
 
 32
 As the litigation now stands, British Airways and British Caledonian have obtained an injunction by the English Court of Appeal restraining Laker from prosecuting its civil antitrust claim against them. Swissair and Lufthansa have applied for similar relief, but their applications are still pending. However, they are apparently protected by the interim injunctions that prevent Laker from taking any action in United States courts to thwart their 21 January 1983 claim for relief. KLM and Sabena are restrained by the United States District Court from joining the English proceedings.
 
 
 33
 Supported by amici curiae Swissair and Lufthansa, KLM and Sabena challenge the United States District Court's preliminary injunction on appeal to this court.[18] They claim that the injunction was unnecessary to protect the district court's jurisdiction and violates their right to take part in the "parallel" actions commenced in the English courts. Denial of this opportunity, they assert, flouts international principles of comity. Moreover, they charge that the district court ignored Britain's "paramount right" to apply British law to Laker, which is a British subject. Appellants and amici request that we overturn the district court's injunction as a clear abuse of discretion.
 
 II. ANALYSIS
 
 34
 This appeal is the direct result of a clash between two governments asserting jurisdiction to prescribe law over a single series of transactions. The district court's injunction is defended by Laker as necessary to protect the court's jurisdiction. If there is no justification for the court's exercise of jurisdiction, the injunctive relief should necessrily fail. Similarly, if the United Kingdom courts would lack jurisdiction over a claim filed by Sabena and KLM, the district court should be under no obligation to defer to the actions of those foreign tribunals. A true conflict arises only if the national jurisdictions overlap. We must therefore begin our analysis with a review of the recognized bases supporting prescriptive jurisdiction, and then examine whether the alleged facts of this case satisfy those requirements.
 
 
 35
 A. Bases of Concurrent Prescriptive Jurisdiction: Territoriality and Nationality
 
 1. Overview
 
 36
 Territoriality and nationality are the two fundamental jurisdictional bases on which courts of the United States and United Kingdom rely to assert control over the controversy between Laker and the antitrust defendants.
 
 
 37
 The prerogative of a nation to control and regulate activities within its boundaries is an essential, definitional element of sovereignty. Every country has a right to dictate laws governing the conduct of its inhabitants. Consequently, the territoriality base of jurisdiction is universally recognized. It is the most pervasive and basic principle underlying the exercise by nations of prescriptive regulatory power.[19] It is the customary basis of the application of law in virtually every country.[20]
 
 
 38
 In the context of remedial legislation, prohibition of effects is usually indivisible from regulation of causes. Consequently, the principles underlying territorial jurisdiction occasionally permit a state to address conduct causing harmful effects across national borders. Territoriality-based jurisdiction thus allows states to regulate the conduct or status of individuals or property physically situated within the territory, even if the effects of the conduct are felt outside the territory.[21] Conversely, conduct outside the territorial boundary which has or is intended to have a substantial effect within the territory may also be regulated by the state.[22]
 
 
 39
 Just as the locus of the regulated conduct or harm provides a basis of jurisdiction, the identity of the actor may also confer jurisdiction upon a regulating country. The citizenship of an individual or nationality of a corporation has long been a recognized basis which will support the exercise of jurisdiction by a state over persons. Under this head of jurisdiction a state has jurisdiction to prescribe law governing the conduct of its nationals whether the conduct takes place inside or outside the territory of the state.[23]
 
 
 40
 Because two or more states may have legitimate interests in prescribing governing law over a particular controversy, these jurisdictional bases are not mutually exclusive. For example, when the national of one state causes substantial effects in another state, both states may potentially have jurisdiction to prescribe governing law.[24] Thus, under international law, territoriality and nationality often give rise to concurrent jurisdiction.[25] A court faced with assertions of conflicting or inconsistent prescriptive power under facially concurrent jurisdiction must first examine the sufficiency of jurisdictional contacts under each base of jurisdiction to determine whether either claim of jurisdiction is unfounded. If both claims to jurisdiction are legitimately exercised, avenues of conflict resolution must be considered before jurisdiction to prescribe can go forward.
 
 2. United States Jurisdictional Base
 
 41
 The prescriptive application of United States antitrust law to the alleged conspiracies between KLM, Sabena, and the other antitrust defendants is founded upon the harmful effects occurring within the territory of the United States as a direct result of the alleged wrongdoing. Before we examine the nature of those effects and consider whether they support the prescriptive jurisdiction over the claimed conspiracies, we wish to make it clear that this aspect of territorial jurisdiction is entirely consistent with nationally and internationally recognized limits on sovereign authority.
 
 
 42
 It has long been settled law that a country can regulate conduct occurring outside its territory which causes harmful results within its territory.[26] The traditional example of this principle is that of the transnational homicide: when a malefactor in State A shoots a victim across the border in State B, State B can proscribe the harmful conduct.[27] To take a more likely example, embezzlement or unauthorized access to computerized financial accounts can certainly be controlled by the territory where the accounts are located, even though the thief operates by telephone from a distant territory. Other examples are easily multiplied.[28]
 
 
 43
 Even if invisible, the radiating consequences of anti-competitive activities cause economic injuries no less tangible than the harmful effects of assassins' bullets or thieves' telephonic impulses. Thus, legislation to protect domestic economic interests can legitimately reach conduct occurring outside the legislating territory intended to damage the protected interests within the territory. As long as the territorial effects are not so inconsequential as to exceed the bounds of reasonableness imposed by international law,[29] prescriptive jurisdiction is legitimately exercised.
 
 
 44
 The territorial effects doctrine is not an extraterritorial assertion of jurisdiction.[30] Jurisdiction exists only when significant effects were intended within the prescribing territory. Prescriptive jurisdiction is activated only when there is personal jurisdiction, often referred to as "jurisdiction to adjudicate." A foreign corporation doing business within the United States reasonably expects that its United States operations will be regulated by United States law. The only extraterritoriality about the transactions reached under the territorial effects doctrine is that not all of the causative factors producing the proscribed result may have occurred within the territory. Although some of the business decisions affecting United States operations may be made outside the forum state, the entire transaction is not ordinarily immunized.
 
 
 45
 Certainly the doctrine of territorial sovereignty is not such an artificial limit on the vindication of legitimate sovereign interests that the injured state confronts the wrong side of a one-way glass, powerless to counteract harmful effects originating outside its boundaries which easily pierce its "sovereign" walls, while its own regulatory efforts are reflected back in its face.[31] Unless one admits that there are certain vital interests that can be affected with impunity by careful selection of the decision-making forum, with the result that a country may be forced to rely entirely on the good offices of a foreign state for vindication of the forum's interests--even when vindication of the forum state's own policies--then availability of territorial effects jurisdiction must be recognized. For these reasons territorial effects jurisdiction has been implemented by several European forums.[32] Indeed, the British have vigorously legislated on this principle in the Protection of Trading Interests Act.
 
 
 46
 a. Territorial Contacts Justifying Application of United States Antitrust Law.
 
 
 47
 The circumstances of this litigation suggest numerous American interests that would be vindicated if Laker is permitted to proceed with its antitrust claim. Although some of the alleged anticompetitive actions occurred within the United States,[33] most of the conspiratorial acts took place in other countries. This distinction, however, has no overriding significance, since the economic consequences of the alleged actions gravely impair significant American interests. If the only interest involved were that of Laker, a British corporation, then it may very well be that United States jurisdiction to prescribe would not exist. However, Laker is in liquidation. Therefore its interests are only nominal compared to those claiming through it.
 
 
 48
 A primary objective of antitrust laws is to preserve competition, and thus ultimately protect the interests of American consumers.[34] For decades, a great percentage of passengers on North Atlantic air routes has been United States citizens.[35] The greatest impact of a predatory pricing conspiracy would be to raise fares for United States passengers. No other single nation has nearly the same interest in consumer protection on the particular combination of routes involved in Laker's antitrust claims. Application of antitrust laws would thus directly benefit American consumers.
 
 
 49
 Because Laker is currently being liquidated, the claims of its creditors are even more directly at stake than consumer interests. Laker is now little more than a corporate conduit through which its assets, including any damages owed Laker, will pass to its creditors. Its antitrust action is primarily an effort to satisfy its creditors, who ultimately bear the brunt of the injury allegedly inflicted upon Laker.
 
 
 50
 Although the precipitous actions of the British airline defendants prevented the district court from conducting a thorough inquiry into the underlying facts relevant to this aspect of the litigation, the facts indicate that Laker's principal creditors are Americans. Laker's fleet of American manufactured DC-10 aircraft was largely financed by banks and other lending institutions in the United States.[36] Moreover, a substantial portion of its total debt obligations are likely to have been American, since the bulk of the debts and expenses were payable in American dollars.[37] The actions of the alleged conspirators destroyed the ability of Laker to repay these American creditors; any antitrust recovery will therefore benefit these United States interests.
 
 
 51
 In addition to the protection of American consumers' and creditors' interests, the United States has a substantial interest in regulating the conduct of business within the United States. The landing rights granted to appellants are permits to do business in this country. Foreign airlines fly in the United States on the prerequisite of obeying United States law.[38] They have offices and employees within the United States, and conduct substantial operations here. By engaging in this commercial business they subject themselves to the in personam jurisdiction of the host country's courts. They waive either expressly or implicitly other objections that might otherwise be raised in defense.[39] A major reason for this subjection to business regulation is to place foreign corporations generally in the same position as domestic businesses.[40] Thus, United States creditors are entitled to, and do, rely on their ability to enforce their claims against foreign corporations like the appellants.
 
 
 52
 This equivalency works in both directions. Foreign corporations are privileged to, and do, rely on United States law.[41] Consequently, creditors rely on the ability of foreign corporations, not only to be sued, but to sue in courts. Creditors expect to recover claims derivatively when foreign corporations possess a claim. Foreign corporations thus have the same obligation as domestic corporations--to sue for benefit of creditors when they are financially troubled and need money for satisfaction of creditors' claims.[42]
 
 
 53
 The United States has an interest in maintaining open forums for resolution of creditors' claims. Just as the appellants are expected to abide by the United States laws governing those who do business here, so is Laker entitled to the protection of those laws. Permitting Laker to maintain its antitrust suit satisfies the legitimate expectations of Laker and its creditors.
 
 
 54
 b. Adequacy of United States Territorial Interests
 
 
 55
 It is beyond dispute that these contacts support an exercise of jurisdiction under the Sherman and Clayton Acts. Jurisdiction exists under United States antitrust laws whenever conduct is intended to, and results in, substantial effects within the United States.[43] Under the conspiracy alleged by Laker, the intent to affect American commerce is obvious. The asserted predatory pricing of fares and interference with refinancing attempts were designed specifically to drive Laker out of business and eventually to raise the fares paid by transatlantic passengers, the bulk of whom are American.
 
 
 56
 Substantial realization of those intended effects has also been alleged by Laker. Laker was forced into liquidation shortly after its refinancing attempts collapsed. Its creditors have not yet been satisfied. The downward pressure on fares induced by Laker's competition, which previously benefitted transatlantic passengers, has been eliminated. Moreover, providing a forum for Laker's suit would also respect domestic creditors' reliance on the ability of foreign corporations to sue and be sued under the United States laws which ordinarily govern the business operations of foreign corporations within the United States. Thus, significant and long standing American economic interests would be vindicated through a successful antitrust action by Laker.
 
 3. British Jurisdictional Base
 
 57
 Some of the British jurisdictional contacts are territorial. The plaintiff did business on routes between the United States and United Kingdom. A number of the purported conspiratorial acts took place in Great Britain. The conspiracy allegedly caused bankruptcy of a corporation operating in Great Britain.
 
 
 58
 However, the primary base of jurisdiction is the British nationality of the parties involved in the transactions cited in Laker's complaint.[44] Laker itself is incorporated under Jersey law, and is thus a British national for purposes of this litigation. Two of the named defendants, British Airways and British Caledonian, are also incorporated under British law. In addition, the conspiracy may also tangentially implicate the activities of other British entities such as the Bank of England and the Civil Aviation Authority.[45]
 
 
 59
 Regulating the activities of businesses incorporated within a state is one of the oldest and most established examples of prescriptive jurisdiction.[46] We cannot say that these nationality-based jurisdictional contacts would be insufficient to support British jurisdiction over a claim filed by KLM or Sabena, especially when the conspiracy charged does have territorial contacts with the United Kingdom. Thus, existence of British jurisdiction to prescribe is not seriously challenged by Laker.
 
 4. Concurrent Jurisdiction
 
 60
 The sufficiency of jurisdictional contacts with both the United States and England results in concurrent jurisdiction to prescribe. Both forums may legitimately exercise this power to regulate the events that allegedly transpired as a result of the asserted conspiracy.
 
 
 61
 Concurrent jurisdiction does not necessarily entail conflicting jurisdiction. The mere existence of dual grounds of prescriptive jurisdiction does not oust either one of the regulating forums. Thus, each forum is ordinarily free to proceed to a judgment.
 
 
 62
 In the current situation, appellants charge that the district court abused its discretion by forbidding them from joining the "parallel" proceeding in the English courts. They argue that this result is compelled both by principles of comity and by respect for a country's paramount interest in controlling the remedies available to its nationals. Before we can fully consider the extent of appellants' rights based on comity and Laker's nationality to participate in the English proceedings, we examine whether the district court's injunction contravenes the well-established limits on the use of in personam injunctions against litigation in foreign jurisdictions.
 
 B. Propriety of the Antisuit Injunction
 
 63
 It is well settled that English and American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions.[47] However, the fundamental corollary to concurrent jurisdiction must ordinarily be respected: parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other.[48] The mere filing of a suit in one forum does not cut off the preexisting right of an independent forum to regulate matters subject to its prescriptive jurisdiction. For this reason, injunctions restraining litigants from proceeding in courts of independent countries are rarely issued.[49]
 
 
 64
 A second reason cautioning against exercise of the power is avoiding the impedance of the foreign jurisdiction. Injunctions operate only on the parties within the personal jurisdiction of the courts. However, they effectively restrict the foreign court's ability to exercise its jurisdiction.[50] If the foreign court reacts with a similar injunction, no party may be able to obtain any remedy.[51] Thus, only in the most compelling circumstances does a court have discretion to issue an antisuit injunction.
 
 
 65
 There are no precise rules governing the appropriateness of antisuit injunctions. The equitable circumstances surrounding each request for an injunction must be carefully examined to determine whether, in light of the principles outlined above, the injunction is required to prevent an irreparable miscarriage of justice. Injunctions are most often necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum. We consider the applicability of each category in turn.
 
 1. Protection of Jurisdiction
 
 66
 Courts have a duty to protect their legitimately conferred jurisdiction to the extent necessary to provide full justice to litigants. Thus, when the action of a litigant in another forum threatens to paralyze the jurisdiction of the court, the court may consider the effectiveness and propriety of issuing an injunction against the litigant's participation in the foreign proceedings.
 
 
 67
 These situations may arise either before or after a judgment has been entered.[52] The policies that guide the exercise of discretion vary slightly in each situation. When the injunction is requested after a previous judgment on the merits, there is little interference with the rule favoring parallel proceedings in matters subject to concurrent jurisdiction.[53] Thus, a court may freely protect the integrity of its judgments by preventing their evasion through vexatious or oppressive relitigation.[54]
 
 
 68
 However, when a party requests the issuance of an injunction to protect the court's jurisdiction before a judgment has been reached, the rules are less clear. Some courts issue the injunction when the parties and issues are identical in both actions, justifying the injunction as necessary to prevent duplicative and, therefore, "vexatious" litigation.[55] However, this rationale is prima facie inconsistent with the rule permitting parallel proceedings in concurrent in personam actions. The policies underlying this rule--avoiding hardship to parties and promoting the economies of consolidated litigation--are more properly considered in a motion for dismissal for forum non conveniens.[56] They do not outweigh the important principles of comity that compel deference and mutual respect for concurrent foreign proceedings. Thus, the better rule is that duplication of parties and issues alone is not sufficient to justify issuance of an antisuit injunction.[57]
 
 
 69
 Similarly, the possibility of an "embarrassing race to judgment" or potentially inconsistent adjudications[58] does not outweigh the respect and deference owed to independent foreign proceedings.[59] The parallel proceeding rule applies only until a judgment is reached in one of the actions.[60] After that point, the second forum is usually obliged to respect the prior adjudication of the matter.[61] If the rules regarding enforcement of foreign judgments are followed there will seldom be a case where parties reach inconsistent judgments.
 
 
 70
 There is little, if any, evidence of courts sacrificing procedural or substantive justice in an effort to "race" to a prior judgment. To the extent this slight risk exists it is outweighed by the more important policies favoring respect for concurrent proceedings. In any event, most forums need not fear that their crucial policies would be trampled if a foreign judgment is reached first, since violation of domestic public policy may justify not enforcing the foreign judgment.[62]
 
 
 71
 These and other factors[63] relied upon to support issuance of prejudgment protective injunctions in aid of jurisdiction do not usually outweigh the importance of permitting foreign concurrent actions. Thus, although they suggest possible bases favoring the district court's decision to enjoin the appellants, we do not find them controlling.
 
 
 72
 The logical reciprocal of the parallel proceeding rule proves that there must be circumstances in which an antisuit injunction is necessary to conserve the court's ability to reach a judgment. Just as the parallel proceeding rule counsels against interference with a foreign court's exercise of concurrent jurisdiction, it authorizes the domestic court to resist the attempts of a foreign court to interfere with an in personam action before the domestic court.[64] When the availability of an action in the domestic courts is necessary to a full and fair adjudication of the plaintiff's claims, a court should preserve that forum.[65] 5] Thus, where the foreign proceeding is not following a parallel track but attempts to carve out exclusive jurisdiction over concurrent actions, an injunction may be necessary to avoid the possibility of losing validly invoked jurisdiction. This would be particularly true if the foreign forum did not offer the remedy sought in the domestic forum.
 
 
 73
 The district court's injunction was clearly proper under these principles. As far as could be determined by the initial pleadings and papers filed, jurisdiction to prescribe was properly exercised. Consequently, the court's ability to render a just and final judgment had to be protected, absent clear evidence that the foreign action could fully consider the litigant's claims.
 
 
 74
 Appellants characterize the district court's injunction as an improper attempt to reserve to the district court's exclusive jurisdiction an action that should be allowed to proceed simultaneously in parallel forums. Actually, the reverse is true. The English action was initiated for the purpose of reserving exclusive prescriptive jurisdiction to the English courts, even though the English courts do not and can not pretend to offer the plaintiffs here the remedies afforded by the American antitrust laws.
 
 
 75
 Although concurrently authorized by overlapping principles of prescriptive jurisdiction, the British and American actions are not parallel proceedings in the sense the term is normally used. This is not a situation where two courts are proceeding to separate judgments simultaneously under one cause of action. Rather, the sole purpose of the English proceeding is to terminate the American action. The writs filed in the High Court of Justice sought to paralyze or halt the proceedings before the United States District Court. Although they also sought a determination that the defendants had not engaged in any unlawful conduct, the clear thrust of the requested relief was the termination of the United States antitrust claim.[66] Appellants conceded at oral argument that they are not interested in concurrent proceedings in the courts of the United Kingdom--they want only the abandonment or dismissal of the American action against them.[67] Further proof of this is Judge Greene's offer to draft the injunction more narrowly to permit certain proceedings that were not inconsistent with the unhindered continuation of the United States antitrust action.[68] That no suggestions were made by the appellants to narrow the injunction indicates that they are only interested in interfering with the antitrust action, and not in adjudicating the existence of an unlawful conspiracy under British law.
 
 
 76
 Judge Greene faced the stark choice of either protecting or relinquishing his jurisdiction. Midland Bank had previously obtained a preemptive interim injunction against Laker's naming it as a defendant in a United States antitrust action. Subsequently all of the foreign defendants in No. 82-3362 appeared in the High Court of Justice without notice to either Laker or the United States District Court and obtained interim protection. The remaining defendants, although domestic corporations, had to be restrained from attempting to follow the same path. It was equally clear that appellants also intended to seek English injunctive relief. Due to the lack of any prior notice by the four foreign defendants, the district court was threatened with a potential fait accompli by the appellants which would have virtually eliminated the court's effective jurisdiction over Laker's facially valid claim. Given the tensions between the parties, it is likely that the threat worsened every day. Thus, there was nothing improper in the district court's decision to enjoin appellants from seeking to participate in the English proceedings solely designed to rob the court of its jurisdiction.
 
 2. Evasion of Important Public Policies
 
 77
 Antisuit injunctions are also justified when necessary to prevent litigants' evasion of the forum's important public policies.[69] This principle is similar to the rule that a foreign judgment not entitled to full faith and credit under the Constitution will not be enforced within the United States when contrary to the crucial public policies of the forum in which enforcement is requested.[70] Both rules recognize that a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests.[71]
 
 
 78
 The standard for refusing to enforce judgments on public policy grounds is strict; defendants are rarely able to block judgments on these grounds.[72] Enjoining participation in a foreign lawsuit in order to preempt a potential judgment is a much greater interference with an independent country's judicial processes. It follows that an antisuit injunction will issue to preclude participation in the litigation only when the strongest equitable factors favor its use.[73] Both the importance to the forum of the law allegedly evaded, and the identity of the potentially evading party are relevant.
 
 
 79
 In this situation, the district court's injunction properly prevented appellants from attempting to escape application of the antitrust laws to their conduct of business here in the United States. KLM and Sabena seek to evade culpability under statutes of admitted economic importance to the United States[74] which are specifically applicable to their activities in the United States, and upon which Laker may have legitimately relied.
 
 
 80
 Whatever the merits of the British defendants' claims based upon the Bermuda II Treaty,[75] KLM and Sabena have no claim to antitrust immunity under their air service treaties. In fact, far from conferring any immunity, their treaties contain express language subjecting them to the jurisdiction of the United States over predatory pricing and abuse of monopoly power. Article Twelve of the United States-Belgium Air Transport Services Agreement provides,
 
 
 81
 (1) Each Party shall allow prices for air transportation to be established by each designated airline based upon commercial considerations in the marketplace. Intervention by the Parties shall be limited to:
 
 
 82
 (a) prevention of predatory or discriminatory prices or practices;
 
 
 83
 (b) protection of consumers from prices that are unduly high or restrictive because of the abuse of a dominant position; and
 
 
 84
 (c) protection of airlines from prices that are artificially low because of direct or indirect governmental subsidy or support.[76]
 
 
 85
 There is similar language in the United States-Netherlands air service agreement[77] and the United States-Germany[78] air service agreement.
 
 
 86
 These provisions were all negotiated recently, at a time when the countries could be expected to have been familiar with the United States' position regarding enforcement of its antitrust laws over foreign corporations operating in the United States. Significantly, in the face of these express treaty provisions appellants have not asserted before the United States courts any claim to immunity under the air service treaties.
 
 
 87
 In light of these treaty provisions, we find it offensive that KLM and Sabena attempt to ride on the coattails of the British airlines under the Bermuda II Treaty and the British Protection of Trading Interests Act, which were respectively intended to regulate British air carriage and to protect primarily the economic interests of British domestic corporations. We do not see how a suit by a British corporation against Dutch and Belgian corporations involving anticompetitive activities allegedly taken by the defendants to protect their United States-Dutch and United States-Belgian air markets adversely implicates British trading interests. British interests would be damaged only if a British corporation will have to pay the judgment. Conceivably, British trading interests may even be furthered by retaining KLM, Sabena, and the other non-British parties to the action, since a judgment against any one of them would contribute towards the full satisfaction of the creditors' claims against a British corporation in liquidation.
 
 
 88
 KLM and Sabena are not less properly enjoined from pursuing the British litigation by virtue of their status as foreign corporations. Because of the inherent interference of an antisuit injunction, injunctions are occasionally limited to restrain only residents of the forum state from pursuing foreign litigation, and do not necessarily run to all those who would be subject to the forum state's in personam jurisdiction. However, on occasion, circumstances have even permitted restraints on actions by foreign parties in other forums.[79]
 
 
 89
 The propriety of such a restraint should be clear with respect to KLM and Sabena. Foreign corporations doing business in the enjoining forum are expected to abide by the forum's laws. We recognize that the British Government disputes the right of the United States to apply its antitrust laws to British air carriers operating in the United States. However, KLM and Sabena have not argued that their status as air carriers under their air service treaties guarantees them any special status in this regard. Indeed, their treaties permit signatory government intervention to redress predatory prices or abuse of dominant market position. In this situation, KLM and Sabena should be treated as any other resident or corporation operating within this country. They are not permitted to escape forum policies any more than other residents.
 
 
 90
 Sabena's argument that the district court's antisuit injunction "compels Britain to acquiesce in conduct by its nationals that may violate its policies disfavoring international application of treble damages laws"[80] is disengenuous. The district court's order does not compel Britain to do anything, but only preserves free access to United States courts. The British Government is free to pursue other sanctions against Laker.[81]
 
 3. Effect of the English Injunctions
 
 91
 The district court's injunction was within its discretion even though the United Kingdom courts have issued in personam injunctions stopping Laker from proceeding against British Airways and British Caledonian. Long experience derived from this country's federal system teaches that a forum state may,[82] but need not,[83] stay its own proceedings in response to an antisuit injunction against a party before the court. This is consistent with the general rule permitting concurrent proceedings on transitory causes of action.[84] In extreme cases it may even be necessary to issue a counterinjunction to thwart another state's attempt to assert exclusive jurisdiction over a matter legitimately subject to concurrent jurisdiction.[85]
 
 
 92
 In suits involving states, even the Full Faith and Credit Clause does not compel recognition of an antisuit injunction. In Pacific Employers Insurance Co. v. Industrial Accident Commission[86] the Supreme Court held that when two states each create an exclusive remedy for a liability which each state has jurisdiction to impose, neither is bound to defer to the other's jurisdiction by enforcing the other jurisdiction's remedy to the exclusion of its own. Although one state may exercise its prescriptive jurisdiction to create an "exclusive" remedy for an injury, absent some other overriding constitutional stricture, that exclusivity is never so total as to prevent another sovereign from disregarding a foreign remedy in favor of its own administrative scheme tailored to serve its unique needs.
 
 
 93
 The same result is reached here a fortiori, since the mandatory policies of the Full Faith and Credit Clause do not apply to international assertions of exclusive jurisdiction. The antisuit injunction was a necessary and proper vehicle to protect the United States District Court's jurisdiction and prevent the evasion by KLM and Sabena of important domestic laws governing their conduct of business within the United States.
 
 C. Paramount Nationality
 
 94
 We turn now to the appellants' argument that Laker's nationality requires the United States District Court to defer to the injunctions issued by the courts of the United Kingdom.
 
 
 95
 KLM and Sabena do not dispute the power of the United States District Court to issue the injunction. They contend rather that the district court abused its discretion by issuing an antisuit injunction instead of relinquishing its jurisdiction, staying its proceedings, or adopting some other vehicle of conflict resolution. Appellants are therefore in the contradictory position of supporting the right of English courts to issue an antisuit injunction, but opposing the United States District Court's issuance of the same kind of injunction. The only way appellants can differentiate between the two injunctions is to focus on the nationality of Laker.
 
 
 96
 The similarity of the injunctions is underscored by the way Sabena phrased the issue posed by this case: "which sovereign, the United States or Great Britain, has the right to determine whether British law permits Laker to conduct private treble damage actions in the United States."[87] As counsel for Sabena recognized at oral argument, whether British law permits or proscribes certain activities is primarily a matter for the British courts to determine.[88] On parity of reasoning the availability of treble damage actions in United States courts is a question of United States law. Appellants' case thus hinges entirely on the consequences attending the existence in one court of nationality-based jurisdiction over Laker.
 
 
 97
 Appellants attempt to prioritize the authority of the courts to proceed in cases of concurrent jurisdiction by arguing that the nationality of the plaintiff gives the plaintiff's state an inherent advantage which displaces all other jurisdictional bases. They label this principle "paramount nationality," and present this as the theory of conflict resolution to be used when concurrent jurisdiction is present: "assuming that two or more states exercise jurisdiction over Laker's allegations, the state with jurisdiction over its national must have the paramount right to determine whether and, if so, where litigation by that national may go forward."[89]
 
 
 98
 We are asked to recognize an entirely novel rule. Although a court has power to enjoin its nationals from suing in foreign jurisdictions, it does not follow that the United States courts must recognize an absolute right of the British government to regulate the remedies that the United States may wish to create for British nationals in United States courts. The purported principle of paramount nationality is entirely unknown in national and international law. Territoriality, not nationality, is the customary and preferred base of jurisdiction.[90] Moreover, no rule of international law or national law precludes an exercise of jurisdiction solely because another state has jurisdiction.[91] In fact, international law recognizes that a state with a territorial basis for its prescriptive juridsiction may establish laws intended to prevent compliance with legislation established under authority of nationality-based jurisdiction.[92]
 
 
 99
 All proposed methods of avoiding conflicts stemming from concurrent jurisdiction indicate that nationality of the parties is only one factor to consider, not the paramount or controlling factor.[93] Appellants have not cited any cases where the principle has been followed as a method of choosing between competing claims of jurisdiction, despite the numerous occasions when the principle could have been decisive.[94] As this paucity of case law implies, significant adverse consequences would attend the adoption of this rule, and we decline to do so.
 
 
 100
 The rationale behind the claim of paramount nationality seems to be that particularly important foreign sovereign prerogatives are infringed when a foreign national sues in domestic courts against the wishes of a foreign state. However, this argument ignores the stronger policy interests of the domestic forum. If a country has a right to regulate the conduct of its nationals, then a fortiori it has the power to regulate the activities of its very governmental organizations, such as its courts, which it establishes and maintains for the purpose of furthering its own public policies.
 
 
 101
 United States courts must control the access to their forums. No foreign court can supersede the right and obligation of the United States courts to decide whether Congress has created a remedy for those injured by trade practices adversely affecting United States interests. Our courts are not required to stand by while Britain attempts to close a courthouse door that Congress, under its territorial jurisdiction, has opened to foreign corporations. Under the nationality base of jurisdiction, Britain can punish its corporations for walking through that courthouse door, but it cannot close the American door. Thus, although British courts can sanction their citizens for resorting to United States antitrust remedies, United States courts are not required to cut off the availability of the remedy.
 
 
 102
 The position advanced by appellant would require United States courts to defer to British policy when there is no statement by Congress that it does not wish the courts to provide the remedy. Appellants' argument that there is no absolute duty to exercise jurisdiction has no merit in this context.[95] It is based on abstention and forum non conveniens cases, which in turn are premised on the availability of a second forum that can fully resolve the plaintiff's claims. In this case, the English Court of Appeal has admitted that there is no other forum for Laker's claims.
 
 
 103
 Besides lacking any basis in national or international law, and besides ignoring important domestic interests, the paramount nationality rule would generate more interference than it would resolve. Legislation based on nationality tends to encourage chauvinism and discrimination without enhancing international comity.[96] The paramount nationality rule would be no exception. Foreign plaintiffs in our courts could routinely face public policy challenges in their domestic courts, while our courts would be required to stay proceedings pending foreign authorization. On the other hand, as the district court noted, United States courts could use corporate nationality as a pretext to interject themselves in foreign proceedings involving United States corporations and subsidiaries.[97]
 
 
 104
 The paramount nationality rule would also be impractical to administer. It would be difficult or impossible to determine when the nationality of a corporation is sufficiently strong that legitimate territorial contacts should be nullified.[98] There are at least five competing methods of determining nationality of a corporation.[99] Multiple countries could simultaneously assert controlling jurisdiction over one "national" corporation based, for example, on shareholder nationality, state of incorporation, or other corporate links to a particular forum. There would be no paramount nation in this situation. The conflicts associated with concurrent jurisdiction would continue to confront the courts.
 
 
 105
 Finally, KLM and Sabena are not British nationals. Thus, their claims are fundamentally different from those advanced by British Airways and British Caledonian. Nothing gives KLM or Sabena a supreme right to vindicate the British national interests that may be implicated by Laker's suits. Sabena, at least, is specifically entitled to the protection of United States anti-trust laws under its air services agreement.[100] KLM no doubt would expect the same protection.[101] No rule of paramount nationality should free them from obligation under United States antitrust laws and at the same time protect them from other corporations' violations. Contrary to appellants' arguments, Laker's nationality is clearly an insufficient basis to reverse the district court.
 
 D. International Comity
 
 106
 Appellants and amici curiae argue strenuously that the district court's injunction violates the crucial principles of comity that regulate and moderate the social and economic intercourse between independent nations. We approach their claims seriously, recognizing that comity serves our international system like the mortar which cements together a brick house. No one would willingly permit the mortar to crumble or be chipped away for fear of compromising the entire structure.
 
 
 107
 "Comity" summarizes in a brief word a complex and elusive concept--the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum. Since comity varies according to the factual circumstances surrounding each claim for its recognition, the absolute boundaries of the duties it imposes are inherently uncertain.[102] However, the central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. The interests of both forums are advanced--the foreign court because its laws and policies have been vindicated; the domestic country because international cooperation and ties have been strengthened. The rule of law is also encouraged, which benefits all nations.[103]
 
 
 108
 Comity is a necessary outgrowth of our international system of politically independent, socio-economically interdependent nation states. As surely as people, products and problems move freely among adjoining countries, so national interests cross territorial borders. But no nation can expect its laws to reach further than its jurisdiction to prescribe, adjudicate, and enforce. Every nation must often rely on other countries to help it achieve its regulatory expectations. Thus, comity compels national courts to act at all times to increase the international legal ties that advance the rule of law within and among nations.
 
 
 109
 However, there are limitations to the application of comity. When the foreign act is inherently inconsistent with the policies underlying comity, domestic recognition could tend either to legitimize the aberration or to encourage retaliation, undercutting the realization of the goals served by comity. No nation is under an unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. Thus, from the earliest times, authorities have recognized that the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act.[104] Case law on the subject is extensive and recognizes the current validity of this exception to comity.[105]
 
 
 110
 Opinions vary as to the degree of prejudice to public policy which should be tolerated before comity will not be followed, but by any definition the injunctions of the United Kingdom courts are not entitled to comity. This is because the action before the United Kingdom courts is specifically intended to interfere with and terminate Laker's United States antitrust suit.
 
 
 111
 The district court's antisuit injunction was purely defensive --it seeks only to preserve the district court's ability to arrive at a final judgment adjudicating Laker's claims under United States law. This judgment would neither make any statement nor imply any views about the wisdom of British antitrust policy. In contrast, the English injunction is purely offensive --it is not designed to protect English jurisdiction, or to allow English courts to proceed to a judgment on the defendant's potential liability under English anticompetitive law free of foreign interference. Rather, the English injunction seeks only to quash the practical power of the United States courts to adjudicate claims under United States law against defendants admittedly subject to the courts' adjudicatory jurisdiction. The Court of Appeal itself recognized that there is no other forum available for resolution of Laker's claims.
 
 
 112
 It is often argued before United States courts that the application of United States antitrust laws to foreign nationals violates principles of comity. Those pleas are legitimately considered.[106] In conducting this inquiry, a court must necessarily examine whether the antitrust laws were clearly intended to reach the injury charged in the complaint.[107] If so, allowing the defendant's conduct to go unregulated could amount to an unjustified evasion of United States law injuring significant domestic interests. This is one context in which comity would not be extended to a foreign act. On the other hand, if the anticompetitive aspect of the alleged injury is not appreciable; the contacts with the United States are attenuated; and the actions of foreign governments denote the existence of strong foreign interests, then comity may suggest a lack of Congressional intent to regulate the alleged conduct.[108] In this context, comity may have a strong bearing on whether application of United States antitrust laws should go forward.[109]
 
 
 113
 However, the appellants' plea to comity is fundamentally different. KLM and Sabena contend that comity compels us to recognize a decision by a foreign government that this court shall not apply its own laws to corporations doing business in this country. Thus, the violation of public policy vitiating comity is not that the evasion of United States antitrust law might injure United States interests, but rather that United States judicial functions have been usurped, destroying the autonomy of the courts. Under the position advanced by appellants, the United States District Court would no longer be free to rule that comity prevented the United States from exercising prescriptive jurisdiction over the defendants, since that determination would be made as of right by a separate forum.[110]
 
 
 114
 In this latter context we cannot rule that the district court abused its discretion to protect its jurisdiction. Between the state courts, the Full Faith and Credit Clause has not been held to compel recognition of an antisuit injunction.[111] A fortiori, the principles of comity do not prevent proceeding in the face of a foreign injunction.
 
 
 115
 Comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action, allowing res judicata to be pled in defense. The appeal to the recognition of comity by the American court in order to permit the critical issues to be adjudicated in England, which is the plea made by appellants here, thus comes based on a very strange predicate. Since the action seeking to determine Laker's right to recover for anticompetitive injuries was first instituted in the United States, the initial opportunity to exercise comity, if this were called for, was put to the United Kingdom courts. No recognition or acceptance of comity was made in those courts. The appellants' claims of comity now asserted in United States courts come burdened with the failure of the British to recognize comity.
 
 
 116
 Although reciprocity may no longer be an absolute prerequisite to comity,[112] certainly our law has not departed so far from common sense that it is reversible error for a court not to capitulate to a foreign judgment based on a statute like the British Protection of Trading Interests Act, designed to prevent the court from resolving legitimate claims placed before it. We cannot forget that the foreign injunction which creates an issue of comity or forbearance was generated by the English Executive's deliberate interference with a proceeding which had been ongoing in the American courts for over six months. Deference to the English courts is now asked in a situation in which all the English courts are doing is supporting and acquiescing in the action taken by their executive. There never would have been any situation in which comity or forbearance would have become an issue if some of the defendants involved in the American suit had not gone into the English courts to generate interference with the American courts.
 
 
 117
 There is simply no visible reason why the British Executive, followed by the British courts, should bar Laker's assertion of a legitimate cause of action in the American courts, except that the British government is intent upon frustrating the antitrust policies of the elective branches of the American government. The effort of the British therefore is not to see that justice is done anywhere, either in the United States or British courts, but to frustrate the enforcement of American law in American courts against companies doing business in America. Absent a clear treaty concluded by the United States Executive Branch, this simply cannot be agreed to by the courts of the United States.
 
 
 118
 Nothing in the British Executive order and directions suggests that they are entitled to comity. The order and directions purport to counteract United States regulation of international trade outside its territorial jurisdiction.[113] The Protection of Trading Interests Act and the order govern "any person in the United Kingdom who carries on business there."[114] They forbid any person in the United Kingdom from furnishing "any commercial document in the United Kingdom," or "any commercial information [apparently regardless of location ] which relates to the said Department of Justice investigation or the grand jury or the District Court proceedings."[115] Even United States airlines would be swept within these broad directives, but for the directions' specific exclusion of United States carriers.
 
 
 119
 The English Executive has thus issued an order to every airline in the world doing business in England to refuse to submit to the jurisdiction of the American court and not to submit any documents from England pursuant to an order of the American court. If the exercise of "extraterritorial" jurisdiction under United States antitrust laws can ever be described as arrogant, the order and directions issued by the British Government certainly bear the same characteristic. United States antitrust laws are enforced where there is an impact in the United States, but only after an adjudication in the United States courts of a violation. Here the English Executive has presumed to bar foreigners from complying with orders of an American court before there is an adjudication by a court on the merits of the dispute.
 
 
 120
 Moreover, since oral argument before this court, the English Secretary of State has interpreted the order and directions to bar the furnishing of any "commercial information," even that located exclusively within United States territory.[116] On the basis of this interpretation the British Government has refused to permit Laker's use of commercial information contained in documents situated in the United States to respond to interrogatories propounded by Trans World Airlines. The orders thus interfere with any attempt by Laker to use any commercial information, whether located in the United Kingdom or the United States, to proceed against any of the defendants, whether British or American.
 
 
 121
 This development completely undermines the appellants' strongest argument in favor of the application of comity--namely, that all United States interests protected under the antitrust laws could be adequately enforced through means other than a treble damage suit, such as a civil or criminal action brought by the Government,[117] or a creditors' class action.[118] Since the British Government is refusing to permit Laker to proceed with its suit even insofar as it relates to American defendants, it is clear that it would prevent Laker's participation in any proceeding designed to vindicate United States interests allegedly harmed as a result of injuries suffered by Laker and its customers.[119] Thus, Laker would be hampered in assisting the plaintiffs in any alternative action. Without crucial information provided by the injured party, Laker, any other suit would be procedurally doomed to failure, regardless of its merits. Therefore, comity can not be extended on the grounds that the British directions protect solely British interests while permitting the United States to vindicate its own policies; the truth, the reality, is far different.
 
 
 122
 If we are guided by the ethical imperative that everyone should act as if his actions were universalized, then the actions of the British Executive in this particular matter scarcely meet the standard of Kant.[120] For, if the United States and a few other countries with major airlines enacted and enforced legislation like the Protection of Trading Interests Act, the result would be unfettered chaos brought about by unresolvable conflicts of jurisdiction the world over. If we were to forbid every American airline and every foreign airline doing business in the United States from producing documents in response to the summons of an English court, or a French court, or a German court, and the French and the German governments were to enact and enforce similar legislation, there could be no complete resolution of any legal dispute involving airlines around the world. The operations of the airlines would be snarled in a criss-cross of overlapping and tangled restrictions to the extent that no airline could be certain of its legal obligations anywhere. Thus, even the practical consequences that would flow from a grant of comity counsel against deferring to the British injunctions triggered by the Protection of Trading Interests Act.[121]
 
 
 123
 There is nothing in the nature of the parties which suggests comity should be exercised. Laker appears before the court as a voluntary plaintiff, under no compulsion to sue. Laker prosecutes its action here subject to sanctions that may be issued against it in the United Kingdom. Thus, there is no suggestion that comity should be exercised to avoid hardship to a party who might otherwise be caught between the inconsistent imperatives of two forums.
 
 
 124
 No facts have been presented here suggesting that the antitrust suit adversely affects the operations of foreign governments. Laker is a privately owned airline. To the extent KLM and Sabena are governmentally owned, they are non-British. The ownership of these airlines implicates no significant interests of Britain as a state. The parties have not seriously asserted otherwise.
 
 
 125
 Similarly, the parties have not invoked either the sovereign immunity doctrine or the act of state doctrine, which insulate from review those foreign governmental actions which are not compatible with judicial scrutiny in our domestic courts. That neither of these doctrines even arguably would apply here is further evidence that no significant British or other governmental interest would be violated by Laker's suit.
 
 
 126
 Although unlikely, it may subsequently be shown that there was sufficient foreign governmental involvement that enforcement of United States antitrust laws is not appropriate.[122] In that event, any of several other well-established principles could be invoked in favor of the defendant.[123] However, these are hurdles that are more appropriately cleared at later stages in the proceeding when the facts are fully developed.
 
 
 127
 Finally, we note that the district court did grant comity to the English orders and proceedings to the extent it could do so consistently with its duty to defend its jurisdiction. The court offered to narrow the scope of its preliminary injunction if KLM or Sabena would submit language permitting the defendants to proceed in Great Britain without leaving them free to secure orders which would interfere with the district court's pending litigation.[124] KLM and Sabena ignored this invitation precisely because their sole purpose is the interference with this action. KLM and Sabena cannot now argue that the district court abused its discretion by entering an overly restrictive injunction in violation of comity.
 
 
 128
 Now a word about the position of our dissenting colleague. We submit that the dissent relies on a skewed view of comity, ignoring the significant prejudice to the administration of justice in our courts under United States laws in order to accommodate the strongly asserted views of the British Executive and Judiciary. However laudatory the impulse to adjust and compromise, we are unable to plunge ahead as the dissent advocates. The path to "the seemly accommodation of ... competing national interests" eked out by the dissent[125] turns comity into quicksand, snares the district court in the very pitfalls which it attempted to avoid, and leads the parties and the district court to a result so vague and ill-defined that it cannot possibly solve the problems raised by the actions of the two governments. This position is neither legally tenable nor pragmatically dictated by the extraordinary circumstances of this litigation.
 
 
 129
 The interpretation of international comity propounded by the dissent is a weak reed indeed under the aggravated facts of this case; it does not rest upon any legal precedent, and ignores the previously recognized limits on the doctrine. The central authority quoted, Hilton v. Guyot, recognizes that comity never obligates a national forum to ignore "the rights of its own citizens or of other persons who are under the protection of its laws."[126] Laker's United States creditors and consumers are entitled to the protection of United States antitrust laws. Furthermore, although not a United States citizen, as a corporation operating within the United States, Laker qualifies as an "other person" entitled to the protection of United States law. Heretofore comity has never been thought to require mandatory deferral to a foreign action primarily intended to cut off these domestic interests.
 
 
 130
 The dissent reaches this tenuous legal conclusion by attempting to discern the implications of Dames & Moore v. Regan, which suggests that a national government may prohibit its nationals from suing in national or other forums.[127]
 
 
 131
 However, in Dames & Moore, the action taken by our government preserved the United States claims and established a remedy for enforcing them against the previously blocked assets of a foreign country--hence against that foreign country. In contrast, the British government, insofar as British corporations are concerned, would just cancel the entire claim--without even permitting single damages. Thus, because Dames & Moore allowed a substitute procedure for enforcing the claims, we cannot equate it with the British position here, even against its own British corporations.
 
 
 132
 Additionally, this is not a suit against a government, but a private action against a private corporation on a claim based on monopolistic practices. The instant facts are thus so far removed from Dames & Moore that it cannot be said that there is anything in the spirit of Dames & Moore which is being violated by the court's injunction.
 
 
 133
 Dames & Moore is silent about the limits on the enforcement of a prohibition against suing in a particular forum. Although a United States citizen would violate United States law by suing in a foreign court in violation of executive agreements similar to those in Dames & Moore, the United States could enforce its own interests without interfering with the autonomy of the foreign judiciary or course of the foreign proceeding. One need look no further than the Protection of Trading Interests Act for any number of remedies: the foreign award could be subject to clawbacks in United States courts, and criminal penalties or fines could be levied. Other civil sanctions could be exacted, such as revocation of business licenses and operating permits. Clearly the United States could enforce its own treaty obligations or domestic interests without taking the initiative to interfere with a foreign jurisdiction. Thus, there is nothing in Dames & Moore which suggests that a district court may not exercise its discretion to enjoin a foreign action when necessary to preserve its jurisdiction.
 
 
 134
 Moreover, where in Dames & Moore the vigorously asserted position of the Executive Branch was a crucial factor in favor of upholding restricted access to domestic forums, here it is the inaction and silence of the Executive Branch which is said to shut off the availability of the United States forum. Only a very small percentage of private antitrust actions are graced by the intervention of the Antitrust Division of the Department of Justice. This has never before been a prerequisite to maintaining a private antitrust claim. If we were to hold that the absence of this intervention indicated a weakness in Laker's case, or prevented it from going forward, we would be making new antitrust law indeed--law which would directly contravene the congressional purposes in establishing a private right of action.
 
 
 135
 There are other weighty reasons why the absence of any current expression of affirmative United States interest should not be fatal to Laker's antitrust action. The American Executive has been in contact with the British Executive seeking to iron out differences under the Bermuda II Treaty.[128] It may very well be that since the State Department is seized with the responsibility for negotiations with the British it has advised the Antitrust Division that it would be inappropriate for that division to take an adversary position in the ongoing private civil suit at this time.
 
 
 136
 The sensitive status of current negotiations may even preclude the Department of State from actively participating in this litigation. Significantly, the British Government is not involved in this litigation either, presumably confining itself to consultation and to the creation and interpretation of the executive orders giving rise to the controversy. This counsels against inviting the Executive to present the views of the United States on remand. Unless and until the views of the American Executive are made known, the absence of any Executive expression of United States sovereign or other interests should not be a bar to proceeding with Laker's suit, or to the protection of jurisdiction to hear the claim.
 
 
 137
 Putting aside the lack of any clear basis in comity, the result reached by the dissent would reverse the district court for abuse of discretion, although the district court has attempted to do what the dissent chastizes the court for omitting. The request for preliminary injunctive relief required immediate action; the dissent itself recognizes that the injunction was "fashioned under the strain of critical moments."[129] Because it was not precisely clear how broadly the injunction needed to be drafted, the court erred on the side of caution, but without prejudice to the rights of the defendants to move to narrow the injunction subsequently. It thus sought to preserve comity by protecting its jurisdiction while permitting foreign proceedings consistent with that jurisdiction.
 
 
 138
 The parties made no request to narrow that injunction. This omission is relevant, not as a waiver of their right to make further requests, but as evidence that there is no narrow relief which can be drafted to protect the admittedly legitimate United States jurisdiction while permitting participation in a British proceeding intended to terminate the American action. It is incongruous to suggest that comity requires a reversal of the district court so that the court can renew its previous offer.
 
 
 139
 In fact, the dissent offers no practical guidance about how the district court's jurisdiction can be guaranteed under the microscopic range of discretion apparently contemplated in the "further proceedings aimed at narrowing the injunction."[130] It states only that the injunction could be narrowed to allow KLM and Sabena to "follow" Swissair and Lufthansa in bringing declaratory judgment actions, barring only "countersuit injunctive relief pendente lite."[131] This is no protection at all for the district court. Swissair and Lufthansa do not seek a declaratory judgment that British law does not permit Laker to sue in American courts. If this were the only request made by Swissair and Lufthansa, then it might very well be permitted.[132]
 
 
 140
 Instead, Lufthansa and Swissair seek a declaration that they did not breach English and other laws regulating restrictive practices. The writs specifically exclude any requests for a declaratory judgment concerning whether United States antitrust laws are violated. However, the accompanying request for relief, which it must be assumed they intend to seek if they succeed in obtaining a favorable declaratory judgment, is not so limited: it seeks an injunction against any action in United States courts based on United States antitrust laws.[133] The breadth of the relief requested is all the more unusual since the declaratory aspect of the writs exclude consideration of the United States antitrust law. By suggesting that KLM and Sabena should be permitted to seek this sort of a declaratory judgment, and, implicitly, obtain the requested relief, the dissent cannot seriously intimate that the district court would effectively protect its jurisdiction.
 
 
 141
 To the extent the dissent would permit the district court to preserve its jurisdiction under the terms of a more limited injunction along the lines contemplated by the district court's proposal, the net result on the desired remand would not be much different from that reached by the majority. There is nothing in our opinion which prevents KLM and Sabena from reconsidering their position or proposing a modification of the district court's order if anything less than complete frustration of the district court's jurisdiction would satisfy the appellants' objective.
 
 
 142
 E. Judicial Reconciliation of Conflicting Assertions of Jurisdiction
 
 
 143
 We recognize that the district court's injunction, precipitated as it was by preemptive interim injunctions in the High Court of Justice, unfortunately will not resolve the deadlock currently facing the parties to this litigation. We have searched for some satisfactory avenue, open to an American court, which would permit the frictionless vindication of the interests of both Britain and the United States. However, there is none, for the British legislation defines the British interest solely in terms of preventing realization of United States interests. The laws are therefore contradictory and mutually inconsistent.
 
 1. Nature of the Conflict
 
 144
 The conflict faced here is not caused by the courts of the two countries. Rather, its sources are the fundamentally opposed national policies toward prohibition of anticompetitive business activity. These policies originate in the legislative and executive decisions of the respective counties.
 
 
 145
 Congress has specifically authorized treble damage actions by foreign corporations to redress injuries to United States foreign commerce.[134] Equally significant, congress has designed the private action as a major component in the enforcement mechanism. The treble damage aspect of private recoveries is the centerpiece of that enforcement mechanism.[135]
 
 
 146
 We find no indication in either the statutory scheme or prior judicial precedent that jurisdiction should not be exercised. Legitimate United States interests in protecting consumers, providing for vindicating creditors' rights, and regulating economic consequences of those doing substantial business in our country are all advanced under the congressionally prescribed scheme. These are more than sufficient jurisdictional contacts under United States v. Aluminum Co. of America[136] and subsequent case law to support the exercise of prescriptive jurisdiction in this case. Congress has been aware of the decades-long controversy accompanying the recurrent assertion of jurisdiction over foreign anticompetitive acts and effects in the United States dating back nearly forty years but has, with limited exceptions,[137] not yet chosen to limit the laws' application or disapprove of the consistent statutory interpretation reached by the courts. Thus, aside from the unprecedented foreign challenge to the application of the antitrust laws, there is nothing in either the facts alleged in the complaint or the circumstances of the litigation which suggests jurisdiction should not be exercised in Laker's suit.
 
 
 147
 The English courts have indicated that they, too, have acted out of the need to implement their mandatory legislative policy, and not out of any ill will towards our courts or the substantive law we are bound to follow. Although the injunctive relief sought by British Airways and British Caledonian set the stage for a direct conflict of jurisdiction, until action by the political branches of the English Government the English courts remained largely acquiescent to Laker's invocation of United States jurisdiction. Justice Parker's well reasoned judgment initially denied the injunctive relief sought by British Airways and British Caledonian. That judgment was rendered even after the district court issued the injunction under appeal here.
 
 
 148
 However, the government of the United Kingdom is now and has historically been opposed to most aspects of United States antitrust policy insofar as it affects business enterprises based in the United Kingdom. The British Government objects to the scope of the prescriptive jurisdiction invoked to apply the antitrust laws; the substantive content of those laws, which is much more aggressive than British regulation of restrictive practices; and the procedural vehicles used in the litigation of the antitrust laws, including private treble damage actions, and the widespread use of pretrial discovery. These policies have been most recently and forcefully expressed in the Protection of Trading Interests Act.[138]
 
 
 149
 The nature of the direct conflict between the political-economic policies of the two countries is put into focus by considering whether the British Government would have been likely to attempt to stop Laker from suing in United States courts if Laker brought a suit other than an antitrust action. If Laker had sued the American defendants for fraud, or on a contract claim for failure of performance, the British would not have been at all interested in intervening, irrespective of the financial condition of Laker at the time it brought the suit. The indifference would not lessen whether British Airways and British Caledonian were included in the group sued by Laker in the United States court. It is the hated application of United States antitrust laws to conduct involving British corporations that has triggered the involvement of the British Government, and ultimately, the British courts.
 
 
 150
 Under the provisions of the Protection of Trading Interests Act, after Justice Parker refused relief, the English Secretary of State issued an order and directions prohibiting all those carrying on business in the United Kingdom, with the exception of United States designated air carriers, from complying with United States antitrust measures arising out of the provision of air carriage by United Kingdom designated airlines under the terms of the Bermuda II Treaty. Because these directions reflected the firm conclusion of the British Executive Branch that British trading interests were being threatened by Laker's antitrust claim, they presented an entirely different situation to the Court of Appeal than that which Justice Parker had faced.[139] The restrictions placed on the British airlines by these orders "fundamentally altered" the perceived ability of the Court of Appeal to permit concurrent actions.[140] Because the directions of the British Executive blocked British Caledonian and British Airways from complying with Laker's discovery requests, the court concluded that the British airlines could not thereafter adequately defend themselves. According to the Court of Appeal, this rendered Laker's claim "wholly untriable" and was therefore "decisive."[141]
 
 
 151
 Thus, to a large extent the conflict of jurisdiction is one generated by the political branches of the governments. There is simply no room for accommodation here if the courts of each country faithfully carry out the laws which they are entrusted to enforce. The Master of the Rolls expressed hope that "the courts of the two countries will ... never be in conflict. The conflict, if there be conflict, will be purely one between the laws of the two countries, for which neither court is responsible."[142] We echo that hope.
 
 2. Judicial Interest Balancing
 
 152
 Even as the political branches of the respective countries have set in motion the legislative policies which have collided in this litigation, they have deprived courts of the ability meaningfully to resolve the problem. The American and English courts are obligated to attempt to reconcile two contradictory laws, each supported by recognized prescriptive jurisdiction, one of which is specifically designed to cancel out the other.
 
 
 153
 The suggestion has been made that this court should engage in some form of interest balancing, permitting only a "reasonable" assertion of prescriptive jurisdiction to be implemented.[143] However, this approach is unsuitable when courts are forced to choose between a domestic law which is designed to protect domestic interests, and a foreign law which is calculated to thwart the implementation of the domestic law in order to protect foreign interests allegedly threatened by the objectives of the domestic law.[144] Interest balancing in this context is hobbled by two primary problems: (1) there are substantial limitations on the court's ability to conduct a neutral balancing of the competing interests, and (2) the adoption of interest balancing is unlikely to achieve its goal of promoting international comity.
 
 
 154
 a. Defects in the Balancing Process
 
 
 155
 Most proposals for interest balancing consist of a long list of national contacts to be evaluated and weighed against those of the foreign country. These interests may be relevant to the desirability of allocating jurisdiction to a particular national forum. However, their usefulness breaks down when a court is faced with the task of selecting one forum's prescriptive jurisdiction over that of another.
 
 
 156
 Many of the contacts to be balanced are already evaluated when assessing the existence of a sufficient basis for exercising prescriptive jurisdiction.[145] Other factors, such as "the extent to which another state may have an interest in regulating the activity," and "the likelihood of conflict with regulation by other states"[146] are essentially neutral in deciding between competing assertions of jurisdiction. Pursuing these inquiries only leads to the obvious conclusion that jurisdiction could be exercised or that there is a conflict, but does not suggest the best avenue of conflict resolution. These types of factors are not useful in resolving the controversy.
 
 
 157
 Those contacts which do purport to provide a basis for distinguishing between competing bases of jurisdiction, and which are thus crucial to the balancing process, generally incorporate purely political factors which the court is neither qualified to evaluate comparatively nor capable of properly balancing. One such proposed consideration is "the degree to which the desirability of such regulation [of restrictive practices] is generally accepted."[147] We doubt whether the legitimacy of an exercise of jurisdiction should be measured by the substantive content of the prescribed law. Moreover, although more and more states are following the United States in regulating restrictive practices, and even exercising jurisdiction based on effects within territory,[148] the differing English and American assessment of the desirability of antitrust law is at the core of the conflict. An English or American court cannot refuse to enforce a law its political branches have already determined is desirable and necessary.
 
 
 158
 The court is also handicapped in any evaluation of "the existence of justified expectations that might be protected or hurt by the regulation in question."[149] In this litigation, whether the reliance of Laker and its creditors on United States antitrust laws is justified depends upon whether one accepts the desirability of United States anti-trust law. Whether the defendants could justifiably have relied on the inapplicability of United States law to their conduct alleged to have caused substantial effects in the United States is based on the same impermissible inquiry. The desirability of applying ambiguous legislation to a particular transaction may imply the presence or absence of legislative intent. However, once a decision is made that the political branches intended to rely on a legitimate base of prescriptive jurisdiction to regulate activities affecting foreign commerce within the domestic forum, the desirability of the law is no longer an issue for the courts.
 
 
 159
 The "importance of regulation to the regulating state"[150] is another factor on which the court cannot rely to choose between two competing, mutually inconsistent legislative policies. We are in no position to adjudicate the relative importance of antitrust regulation or nonregulation to the United States and the United Kingdom. It is the crucial importance of these policies which has created the conflict. A proclamation by judicial fiat that one interest is less "important" than the other will not erase a real conflict.
 
 
 160
 Given the inherent limitations of the Judiciary, which must weigh these issues in the limited context of adversarial litigation, we seriously doubt whether we could adequately chart the competing problems and priorities that inevitably define the scope of any nation's interest in a legislated remedy. This court is ill-equipped to "balance the vital national interests of the United States and the [United Kingdom] to determine which interests predominate."[151] When one state exercises its jurisdiction and another, in protection of its own interests, attempts to quash the first exercise of jurisdiction "it is simply impossible to judicially 'balance' these totally contradictory and mutually negating actions."[152]
 
 
 161
 Besides the difficulty of properly weighing the crucial elements of any interest balancing formula, one other defect in the balancing process prompts our reluctance to adopt this analysis in the context of preservation of jurisdiction. Procedurally, this kind of balancing would be difficult, since it would ordinarily involve drawn-out discovery and requests for submissions by political branches. There was no time for this process in the present case. Either jurisdiction was protected or it was lost. It is unlikely that the employment of a hasty and poorly informed balancing process would have materially aided the district court's evaluation of the exigencies and equities of Laker's request for relief.
 
 
 162
 b. Promotion of International Comity
 
 
 163
 We might be more willing to tackle the problems associated with the balancing of competing, mutually inconsistent national interests if we could be assured that our efforts would strengthen the bonds of international comity. However, the usefulness and wisdom of interest balancing to assess the most "reasonable" exercise of prescriptive jurisdiction has not been affirmatively demonstrated. This approach has not gained more than a temporary foothold in domestic law. Courts are increasingly refusing to adopt the approach.[153] Scholarly criticism has intensified.[154] Additionally, there is no evidence that interest balancing represents a rule of international law. Thus, there is no mandatory rule requiring its adoption here, since Congress cannot be said to have implicitly legislated subject to these international constraints.[155]
 
 
 164
 If promotion of international comity is measured by the number of times United States jurisdiction has been declined under the "reasonableness" interest balancing approach, then it has been a failure. Implementation of this analysis has not resulted in a significant number of conflict resolutions favoring a foreign jurisdiction. A pragmatic assessment of those decisions adopting an interest balancing approach indicates none where United States jurisdiction was declined when there was more than a de minimis United States interest.[156] Most cases in which use of the process was advocated arose before a direct conflict occurred when the balancing could be employed without impairing the court's jurisdiction to determine jurisdiction.[157] When push comes to shove, the domestic forum is rarely unseated.[158]
 
 
 165
 Despite the real obligation of courts to apply international law and foster comity, domestic courts do not sit as internationally constituted tribunals. Domestic courts are created by national constitutions and statutes to enforce primarily national laws.[159] The courts of most developed countries follow international law only to the extent it is not overridden by national law.[160] Thus, courts inherently find it difficult neutrally to balance competing foreign interests.[161] When there is any doubt, national interests will tend to be favored over foreign interests.[162] This partially explains why there have been few times when courts have found foreign interests to prevail.[163]
 
 
 166
 The inherent noncorrelation between the interest balancing formula and the economic realities of modern commerce is an additional reason which may underlie the reluctance of most courts to strike a balance in favor of nonapplication of domestic law. An assertion of prescriptive jurisdiction should ultimately be based on shared assessments that jurisdiction is reasonable.[164] Thus, international law prohibits the assertion of prescriptive jurisdiction unsupported by reasonable links between the forum and the controversy.[165]
 
 
 167
 However, it does not necessarily follow, as the use of interest balancing as a method of choosing between competing jurisdictions assumes, that there is a line of reasonableness which separates jurisdiction to prescribe into neatly adjoining compartments of national jurisdiction. There is no principle of international law which abolishes concurrent jurisdiction.[166] Since prescriptive jurisdiction is based on well recognized state contacts with controversies, the reality of our interlocked international economic network guarantees that overlapping, concurrent jurisdiction will often be present.[167] There is, therefore, no rule of international law holding that a "more reasonable" assertion of jurisdiction mandatorily[168] displaces a "less reasonable" assertion of jurisdiction as long as both are, in fact, consistent with the limitations on jurisdiction imposed by international law.[169] That is the situation faced in this case: the territoriality and nationality bases of jurisdiction of the United Kingdom and the United States are both unimpeached.
 
 
 168
 In our federal system of parallel sovereign courts, several lines of cases recognize that prescriptive jurisdiction is often shared among several forums.[170] Those forums may participate in interforum compacts that provide a basis for allocating jurisdiction to one forum over another.[171] Similarly, the problems associated with overlapping bases of national taxation in international law are directly addressed by numerous bilateral and multilateral treaties rather than a judicially developed rule of exclusive jurisdiction grounded in a prioritization of the relative reasonableness of links between the state and the taxed entity.[172] Because we see no neutral principles on which to distinguish judicially the reasonableness of the concurrent, mutually inconsistent exercises of jurisdiction in this case, we decline to adopt such a rule here.[173]
 
 3. Political Compromise
 
 169
 The district court could capitulate to the British attacking law, at the cost of losing its jurisdiction to implement the substantive policies established by Congress. Alternatively it can act to preserve its jurisdiction, running the risk that counterinjunctions or other sanctions will eventually preclude Laker from achieving any remedy, if it is ultimately entitled to one under United States law. In either case the policies of both countries are likely to be frustrated at the cost of substantial prejudice to the litigants' rights.
 
 
 170
 We unhesitatingly conclude that United States jurisdiction to prescribe its antitrust laws must go forward and was therefore properly protected by the district court. Despite the contrary assertions of the British government, there is no indication in this case that the limits of international law are exceeded by either country's exercise of prescriptive jurisdiction. But even so, application of national law may go forward despite a conflict with international law. Both Britain and the United States recognize this rule.[174] It follows a fortiori that national laws do not evaporate when counteracted by the legislation of another sovereign.
 
 
 171
 Although, in the interest of amicable relations, we might be tempted to defuse unilaterally the confrontation by jettisoning our jurisdiction, we could not, for this is not our proper judicial role. The problem in this case is essentially a political one, arising from the vast difference in the political-economic theories of the two governments which has existed for many years. Both nations have jurisdiction to prescribe and adjudicate. Both have asserted that jurisdiction. However, this conflict alone does not place the court in a position to initiate a political compromise based on its decision that United States laws should not be enforced when a foreign jurisdiction, contrary to the domestic court's statutory duty, attempts to eradicate the domestic jurisdiction. Judges are not politicians. The courts are not organs of political compromise. It is impossible in this case, with all the good will manifested by the English Justices and ourselves, to negotiate an extraordinarily long arms-length agreement on the respective impact of our countries' policies regulating anti-competitive business practices.
 
 
 172
 It is permissible for courts to disengage when judicial scrutiny would implicate inherently unreviewable actions, such as conduct falling within the act of state or sovereign immunity doctrines. But both institutional limitations on the judicial process and Constitutional restrictions on the exercise of judicial power make it unacceptable for the Judiciary to seize the political initiative and determine that legitimate application of American laws must evaporate when challenged by a foreign jurisdiction.[175]
 
 
 173
 Unilateral abandonment by the Judiciary of legitimately prescribed national law in response to foreign counter-legislation would not materially advance the principles of comity and international accommodation which must form the foundation of any international system comprised of coequal nation states. The British Government's invocation of the Protection of Trading Interests Act to foreclose any proceeding in a non-English forum brought to recover damages for trade injuries caused by unlawful conspiracies is a naked attempt exclusively to reserve by confrontation an area of prescriptive jurisdiction shared concurrently by other nations. This assertion of interdictory jurisdiction propels into the courts a controversy whose eventual termination is restricted to two unsatisfactory alternatives: (1) either one state or the other will eventually capitulate, sacrificing its legitimate interests, or (2) a deadlock will occur to the eventual frustration of both the states' and the litigants' interests. The underlying goal of the legislation is apparently to compel the United States to cede its claims to regulate those aspects of its domestic economy deemed objectionable by the United Kingdom. However, the possibility of a cooperative, mutually profitable compromise by all affected countries is greatly restricted. Granting recognition to this form of coercion will only retard the growth of international mechanisms necessary to resolve satisfactorily the problems generated when radically divergent national policies intersect in an area of concurrent jurisdiction.
 
 
 174
 Rather than legitimizing the interference and stultifying effects that would follow widespread acceptance of interdictory jurisdiction, we prefer to permit Laker's suit, based as it is on well recognized prescriptive jurisdiction, to go forward as free as possible from the interference caused by foreign antisuit injunctions.
 
 III. CONCLUSION
 
 175
 The conflict in jurisdiction we confront today has been precipitated by the attempts of another country to insulate its own business entities from the necessity of complying with legislation of our country designed to protect this country's domestic policies. At the root of the conflict are the fundamentally opposed policies of the United States and Great Britain regarding the desirability, scope, and implementation of legislation controlling anticompetitive and restrictive business practices.
 
 
 176
 No conceivable judicial disposition of this appeal would remove that underlying conflict. Because of the potential deadlock that appears to be developing, the ultimate question is not whether conflicting assertions of national interest must be reconciled, but the proper forum of reconciliation. The resources of the Judiciary are inherently limited when faced with an affirmative decision by the political branches of the government to prescribe specific policies. Absent an explicit directive from Congress, this court has neither the authority nor the institutional resources to weigh the policy and political factors that must be evaluated when resolving competing claims of jurisdiction. In contrast, diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association.[176] These forums should and, we hope, will be utilized to avoid or resolve conflicts caused by contradictory assertions of concurrent prescriptive jurisdiction.[177]
 
 
 177
 However, in the absence of some emanation from the Executive Branch,[178] Laker's suit may go forward against appellants. Laker seeks to recover for injuries it allegedly sustained as a result of the defendants' conduct in violation of United States antitrust laws. The complaint alleges a conspiracy to drive out of business a corporation permitted by United States treaty to operate within the United States and conducting substantial business here. If Laker's allegations are proved, the intended and actual effect in the United States are clear since Laker, which was carrying up to one out of every seven transatlantic passengers, was subsequently forced into liquidation. Resolution of Laker's lawsuit would further the interests protected under United States law, since American creditors' interests in open forums, and consumers' interests in free competition may be vindicated.
 
 
 178
 Under these circumstances, judicial precedent construing the prescriptive jurisdiction of the United States antitrust laws unequivocally holds that the antitrust laws should be applied. That jurisdiction is well within the bounds of reason imposed by international law. Because the factual circumstances of this case made a preliminary injunction imperative to preserve the court's jurisdiction, and because that injunction is not proscribed by the principles of international comity, the district court acted within its discretion.
 
 
 179
 The decision of the district court is therefore
 
 
 180
 Affirmed.
 
 STARR, Circuit Judge, dissenting:
 
 181
 It is with reluctance that I am constrained to dissent, for there is much in the majority's thorough opinion with which I fully agree. The majority's opinion demonstrates persuasively that the jurisdictional basis for Laker's action in the United States District Court is firmly established under settled principles of United States and international law. Judge Wilkey's scholarly analysis further demonstrates that it is not at all unusual for a court vested with jurisdiction to issue appropriate orders to vindicate that jurisdiction, even when such orders arrest the prosecution of actions in the courts of another sovereign.
 
 
 182
 But it is my judgment that principles of comity among the courts of the international community counsel strongly against the injunction in the form issued here. The concept of comity of nations, a "blend of courtesy and expedience,"[1] was defined by the Supreme Court in Hilton v. Guyot as
 
 
 183
 the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.
 
 
 184
 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).
 
 
 185
 The difficulty in applying this open-ended idea stems from the fact that " '[c]omity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." Id. at 163-64, 16 S.Ct. at 143-144. Few hard-and-fast rules or talismanic tests are to be found. Nonetheless, it is clear that under appropriate circumstances, United States courts will invoke the principle of comity in recognition of the interests of another sovereign.
 
 
 186
 In light of these principles, it is important to note that this is, at bottom, a private antitrust action filed in a United States court by a foreign litigant against, among others, four United States corporate defendants. This is plainly not an action informed with a public interest beyond that implicated by any private litigant enforcing admittedly important congressionally granted rights. Not only is the instant action not brought by the United States to vindicate sovereign United States interests, but no evidence has been manifested of any sovereign United States interest in the present suit. For whatever reason, and I do not pretend to powers of divination as to why, the Executive has been silent as to what, if any, public interests are touched by Laker's antitrust suit.
 
 
 187
 In stark contrast, it is clear beyond cavil that the British Executive is emphatically interested in this suit brought by a British subject in United States courts. This sovereign interest articulated by representatives of Her Majesty's government, premised upon British disaffection for the operation and reach of United States antitrust laws, is one that I cannot in conscience reasonably discount. After all, Laker is a British subject which carried on its operations as a heavily regulated air carrier under United Kingdom law. Its routes to and from the United States were established under the umbrella of the Bermuda II Treaty between the United Kingdom and the United States. The United Kingdom thus possesses a clear governmental interest in the activities of a now defunct but once heavily regulated British concern.
 
 
 188
 To be sure, Laker's status as a British subject, without more, does not mean that United States courts must unalterably bow to the rulings of British courts in actions filed after the instant suit was in progress. The majority has indeed persuasively demonstrated that no principle of "paramount nationality" is recognized in international law. But I am persuaded that it is not at all incompatible with our oath of office for United States judges to recognize the practical reality that the United Kingdom may in fact ultimately have power to prevent Laker's maintaining any United States antitrust action. And the exercise of such a power should not automatically, without benefit of the views of either the British or United States Executive, be deemed violative of United States public policy. For it seems to me that, while the facts of the case are indeed distinguishable, the spirit of the Supreme Court's ruling in Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), suggests strongly that a sovereign government can prohibit one of its nationals from proceeding in a particular forum, and indeed can require actions to be brought in a specific forum which may not at all be to the citizen's liking. It would appear, albeit from a vantage point from which I confess the players and movements can be perceived only dimly, that the British Executive is moving toward the exercise of precisely the power recognized unanimously as to the Presidency by the United States Supreme Court in Dames & Moore.
 
 
 189
 Admittedly, Dames & Moore was grounded upon the President's foreign relations power, and evidenced the United States judiciary's appropriate and understandable reluctance to take actions that would disrupt or unwind the foreign policy actions of the Executive, particularly in connection with a matter of such moment as the implementation of accords effecting the extrication of American hostages from Tehran. Here, in contrast, the British Executive appears to be proceeding not from the compelling circumstances of a hostage crisis but from its antipathy toward United States antitrust laws. But it is, in my judgment, not for me to say whether the British Executive's attitude in this respect is reasonable or unreasonable. With all respect to the majority, I am not endowed with sufficient knowledge or information on the limited record before us to pass judgment on the British views that my brethren find so distasteful. It may be that the application of United States antitrust laws under the circumstances of Laker's transatlantic traffic is eminently sound and reasonable under principles governing the regulation of trade that is both within and beyond national borders. But today's decision will not settle the raging debate across the Atlantic, and indeed throughout much of the industrialized world, about the application of domestic United States law.
 
 
 190
 The injunction sustained today is, I am thus constrained to conclude, unduly sweeping in light of considerations of comity. To be sure, as the majority quite properly notes, KLM and Sabena failed to avail themselves of the District Court's invitation for suggestions to narrow the injunction's sweep. But failure to seek a narrowing of the order, while reducing the foreign airlines' equities in this court, does not end the issue for me. We take the injunction as we find it, and it cannot reasonably be maintained that the foreign airlines have waived any objection to the order. Indeed, Laker does not so argue, and the majority quite rightly does not ground its result on any such principle.
 
 
 191
 And so we face the injunction itself. By its terms, the District Court's order quite literally forbids the foreign airlines from entering any court in the world, including courts of their own respective nations, to contest Laker's right to maintain the instant action. This approach, fashioned under the strain of critical moments when it reasonably appeared to the learned trial judge that jurisdiction over important defendants might irrevocably be lost, is simply too broad to sustain, in light of the countervailing considerations of comity among nations.[2]
 
 
 192
 Thus, I would favor vacating the present injunction and remanding the case to the District Court for consideration of narrowing its order. The District Court might well decide to enjoin KLM and Sabena only from seeking countersuit injunctive relief pendente lite in the English courts, thus allowing them to follow the example of Lufthansa and Swissair in bringing declaratory judgment actions. This would allow two or more related actions--Laker's antitrust suit and the foreign defendants' declaratory judgment action in foreign court--to proceed simultaneously, without any direct interference from the other sovereign's courts. This type of injunction seems clearly preferable on comity grounds.[3]
 
 
 193
 A foreign court would thus be allowed to adjudicate the status of the parties before it under that nation's laws and regulatory provisions, including any applicable aviation treaties. If both the United States and foreign actions proceeded to judgment, choice of law questions would likely be presented in the execution of the judgments and would be considered at that stage of the litigation. However, several developments in this matter could moot this potential conflict, including a negotiated settlement of the inter-governmental dispute over the scope and applicability of United States antitrust laws; a decision against Laker on the merits in the United States District Court; or a judicial decision against the foreign defendants in the foreign court. A narrow injunction would thus preserve the possibility that the ultimate conflict-of-laws questions would be mooted, either through diplomatic channels or a defeat either for Laker or the foreign airlines in their respective actions. The narrower injunction would result in substantially less interference with foreign courts, with no "surrender" of the jurisdiction of the United States over Laker's antitrust claims.
 
 
 194
 I would further suggest that in the exercise of its sound discretion the District Court invite the Executive to present the views of the United States. Those views might well have an important bearing upon the extent of the sovereign interests of the United States, if any, in this action.[4]
 
 
 195
 A tempest has been brewing for some time among the nations as to the reach of this country's antitrust laws, and today's decision strikes a strong blow in favor of what will be viewed by many of our friends and allies as a rather parochial American outlook. But whether that blow is well conceived, it is, with all respect, at tension with the orderly operation of our two nations' respective judicial systems. As both the majority and the District Court recognize, it is serious business to issue an injunction against proceedings in a sister nation. This is most keenly true with respect to a nation from which we inherited so much of our legal system. Inasmuch as only extraordinary reasons justify the issuance of such an injunction, I would remand the case to the District Court for further proceedings aimed at narrowing the injunction, consistent with the principles of comity that inform the seemly accommodation of sharply divergent and competing national interests.
 
 
 
 [1]
 The appeal of the preliminary injunction at this early stage of the proceedings has not permitted either findings of fact by the district court or a thorough development of the factual underpinnings of Laker's antitrust action
 
 
 [2]
 Appendix of Record Excerpts Submitted on Behalf of Appellants Sabena and KLM at Tab 5 [hereinafter cited as RE]; Brief of Appellant KLM Royal Dutch Airlines at 5, 6
 
 
 [3]
 Agreement Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland Concerning Air Services, 23 July 1977, 28 U.S.T. 5367, T.I.A.S. No. 8641. [hereinafter cited as Bermuda II Treaty]
 
 
 [4]
 Protection of Trading Interests Act, 1980, ch. 11, reproduced at RE Tab 9, supra note 2
 
 
 [5]
 RE Tab 1, supra note 2
 
 
 [6]
 Laker Airways Ltd. v. Pan American World Airways, 559 F.Supp. 1124 (D.D.C.1983) [hereinafter cited as District Court Op.]
 
 
 [7]
 RE Tab 1, supra note 2
 
 
 [8]
 District Court Op., 559 F.Supp. at 1139 n. 63
 
 
 [9]
 Laker Airways Ltd. v. Pan American World Airways, 568 F.Supp. 811 (D.D.C.1983)
 
 
 [10]
 British Airways Board v. Laker Airways Ltd., [1983] 3 W.L.R. 545, 549 [hereinafter cited as High Court Judgment], reproduced at Appendix to Memorandum as to Status of English Proceedings at Tab 5 [hereinafter cited as App.]
 
 
 [11]
 Id. at 568
 
 
 [12]
 See supra note 4
 
 
 [13]
 Id. Secs. 1, 2, 4, 5, 6
 
 
 [14]
 App. Tab 6, supra note 10
 
 
 [15]
 British Airways Board v. Laker Airways Ltd., [1983] 3 W.L.R. 545, 573, 591, reproduced at App. Tab 5, supra note 10 [hereinafter cited as Court of Appeal Judgment]
 
 
 [16]
 App. Tab 7, supra note 10
 
 
 [17]
 On 10 November 1983 the House of Lords granted Laker's petitions for leave to appeal the judgment of the Court of Appeal. This appeal is currently pending
 
 
 [18]
 The four American defendants, who were also enjoined by the district court, have not appealed the decision
 
 
 [19]
 M. MCDOUGAL & W. REISMAN, INTERNATIONAL LAW IN CONTEMPORARY PERSPECTIVE 1295 (1981)
 
 
 [20]
 See, e.g., United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir.1977); RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES Sec. 38 (1965) [hereinafter cited as RESTATEMENT (SECOND) ]
 
 
 [21]
 See RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES Sec. 17 (1965); RESTATEMENT OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (REVISED) Sec. 402(1)(a), (b) (Tentative Draft No. 2) (1981) [hereinafter cited as RESTATEMENT (REVISED) ]
 
 
 [22]
 Federal Trade Comm'n v. Compagnie de Saint-Gobain-Pont-A-Mousson, 636 F.2d 1300, 1316 (D.C.Cir.1980); United States v. Fernandez, 496 F.2d 1294 (5th Cir.1974); RESTATEMENT (SECOND) Sec. 18(b), supra note 20; RESTATEMENT (REVISED) Sec. 402(1)(c) (Tentative Draft No. 2), supra note 21
 
 
 [23]
 See Steele v. Bulova Watch Co., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952); Blackmer v. United States, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); RESTATEMENT (SECOND) Sec. 30(1)(a), supra note 20; RESTATEMENT (REVISED) Sec. 402(2) (Tentative Draft No. 2), supra note 20
 
 
 [24]
 The exercise of prescriptive jurisdiction is, however, subject to the limits of a state's jurisdiction to adjudicate and to enforce its regulations. See, e.g., Federal Trade Comm'n v. Compagnie de Saint-Gobain-Pont-A-Mousson, 636 F.2d 1300, 1316-17 (D.C.Cir.1980)
 
 
 [25]
 See RESTATEMENT (SECOND) Sec. 37, Sec. 30 Comment c, supra note 20
 
 
 [26]
 See, e.g., United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir.1945); Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); Deutsche Lufthansa Aktiengesellschaft v. Civil Aeronautics Board, 479 F.2d 912, 917 n. 9 (D.C.Cir.1973); Pacific Seafarers Inc. v. Pacific Far East Line, Inc., 404 F.2d 804, 814-15 (D.C.Cir.1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969); Case of the S.S. "Lotus," [1927] P.C.I.J., Ser.A., No. 10 at 18, 2 M. Hudson, World Court Reports 20
 
 
 [27]
 See RESTATEMENT (SECOND) Sec. 18 Illustration 2, supra note 20
 
 
 [28]
 See, e.g., United States v. Fernandez, 496 F.2d 1294 (5th Cir.1974) (conviction for possessing, uttering, and forging, in a foreign territory, United States Treasury checks which had been stolen in the United States)
 
 
 [29]
 See RESTATEMENT (REVISED) Sec. 403(1) (Tentative Draft No. 2), supra note 21
 
 
 [30]
 See, e.g., "Extraterritoriality and Conflicts of Jurisdiction," U.S. Department of State Current Policy Bulletin No. 481 (15 April 1983)
 
 
 [31]
 See Rahl, International Application of American Antitrust Laws: Issues and Proposals, 2 N.W.J. INT'L L. & BUS. 336, 341 (1980); Picciotto, Jurisdictional Conflicts, International Law and the International State System, 11 INT'L J. SOC. L. 11, 14-15 (1983)
 
 
 [32]
 These forums include, at least, the Federal Republic of German, Austria, and the European Economic Community. See Gerber, The Extraterritorial Application of the German Antitrust Laws, 77 AM.J.INT'L L. 756 (1983); Rahl, International Application of American Antitrust Laws: Issues and Proposals, 2 N.W. J. INT'L L. 336, 340-41 (1980)
 
 
 [33]
 Laker alleges that acts in furtherance of the unlawful conspiracy occurred at the IATA meeting at Hollywood, Florida in 1981. Complaint p 22, Civil Action No. 83-0416 (D.D.C.1983), reproduced at RE Tab 3, supra note 2. Additionally, secret commissions may have been paid to travel agents within the United States to divert business away from Laker. Complaint p 28, Civil Action No. 82-3362 (D.D.C.1982), reproduced at App.Tab 5 p. 592, supra note 10
 
 
 [34]
 See Pfizer Inc. v. India, 434 U.S. 308, 314, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978)
 
 
 [35]
 Oral Argument Tr. at 32. See also UNITED STATES DEP'T OF TRANSPORTATION, RESEARCH & SPECIAL PROGRAMS ADMIN., U.S. INT'L AIR TRAVEL STATISTICS, Table IIa at 2, 3; Table IId at 2, 3; Table IIIa at 55-57; Table IIId at 46-48; Table IV at 1, 10, 14 (1982)
 
 
 [36]
 Laker Br. at 4
 
 
 [37]
 See id. at 5
 
 
 [38]
 See Protocol Relating to United States-Netherlands Air Transport Agreement of 1957, 31 March 1978, art. 8(c), 29 U.S.T. 3088, 3098, T.I.A.S. No. 8998 [hereinafter cited as United States-Netherlands Air Transport Treaty]; Protocol Relating to the United States of America-Federal Republic of Germany Air Transport Agreement of 1955, 1 November 1978, arts. 8(c), 9(a), 30 U.S.T. 7323, 7340, T.I.A.S. No. 9591 [hereinafter cited as United States-Germany Air Transport Treaty]. The British Government apparently recognizes this as a general rule, although it argues that immunity from United States antitrust laws follows under the Bermuda II Treaty and that application of those laws is inherently limited by territorial sovereignty. Partially in response to representations by counsel for the British Attorney-General that "Her Majesty's Government has consistently taken the position that British Enterprises engaged in transnational business operations should comply with the laws and governmental policies of the countries in which they transact business," Justice Parker stated: "I would regard it as being inherent in the grant of permission to operate in the United States that the designated airlines comply with United States [antitrust] law." See High Court Judgment at 564, 568, supra note 10. This position was qualified by the Court of Appeal. See Court of Appeal Judgment at 583-84, supra note 15
 
 
 [39]
 See Foreign Sovereign Immunities Act, 28 U.S.C. Secs. 1602-1611 (1976); Agreement Providing for Nonassertion of Sovereign Immunity from Suit of Air Transport Enterprises, United States-Netherlands, 19 June 1953, 4 U.S.T. 1610, T.I.A.S. No. 2828
 
 
 [40]
 Cf. William Becker Travel Bureau, Inc. v. Sabena Belgian World Airways, 13 Av.Cas. 17,770 (S.D.N.Y.1975) (Sabena subject to nondiscrimination provisions of Federal Aviation Act, 49 U.S.C. Sec. 1374(b) (1976))
 
 
 [41]
 See, e.g., Pfizer Inc. v. India, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Cf. British Overseas Airways Corp. v. Civil Aeronautics Board, 304 F.2d 952 (D.C.Cir.1962) (action brought by, inter alia, KLM and Sabena seeking review of proposed regulations)
 
 
 [42]
 See Teasdale v. Robinson, 290 F.2d 108, 114 (8th Cir.1961) (fiduciary obligations of corporate officers to creditors are enforceable by the trustee in bankruptcy); 4 COLLIER ON BANKRUPTCY p 704.02 (L. King 15th ed. 1983). Cf. Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 148 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (stockholder free to initiate derivative action when receiver refuses to initiate suit necessary for protection of creditors)
 
 
 [43]
 United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir.1945). See also RESTATEMENT (REVISED) Sec. 415(2), supra note 21:
 Any agreement in restraint of United States trade made outside of the United States, and any conduct or agreement in restraint of such trade carried out predominantly outside of the United States, is subject to the jurisdiction to prescribe of the United States, if a principal purpose of the conduct or agreement is to interfere with the commerce of the United States, and the agreement or conduct has some effect on that commerce.
 (Tentative Draft No. 2).
 
 
 [44]
 See infra p. 934
 
 
 [45]
 See Br. of Appellant Sabena at 9
 
 
 [46]
 See RESTATEMENT (SECOND) Sec. 27, & id. Comment a, supra note 20
 
 
 [47]
 See, e.g., Cole v. Cunningham, 133 U.S. 107, 10 S.Ct. 269, 33 L.Ed. 538 (1890). Cf. Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)
 
 
 [48]
 Colorado River Water Conservancy Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939); Kline v. Burke Const. Co., 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922); Insurance Co. v. Brune's Assignee, 96 U.S. 588, --- S.Ct. ----, 24 L.Ed. 737 (1877). However, proceedings in rem are usually restricted to one forum. See Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939)
 
 
 [49]
 See, e.g., Bryant v. Atlantic Coast Line R.R., 92 F.2d 569 (2d Cir.1937); Blanchard v. Commonwealth Oil Co., 294 F.2d 834, 839 (5th Cir.1961)
 The rules against antisuit injunctions are more relaxed when the injunction runs against concurrent litigation within a single forum. In this situation respect for a co-equal sovereign's jurisdiction is not implicated and is more easily out-weighed by the economies achieved through avoidance of duplicative actions. See Colorado River Water Conservancy Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); Roth v. Bank of the Commonwealth, 583 F.2d 527, 538 (6th Cir.1978). When both actions involve the same parties, issues, and underlying transactions the court whose jurisdiction was first invoked may be justified in restraining litigants from prosecuting subsequently filed suits within the same court system. Failure to distinguish between the different policies informing the discretion to issue intercourt and intracourt injunctions may suggest an inappropriate rule. See, e.g., Western Electric Co. v. Milgo Electronic Corp., 450 F.Supp. 835, 837 (S.D.Fla.1978) (relying on federal intracourt cases in denying injunctive relief against foreign action). In the intercourt context, similarity of the actions alone should not justify an injunction. See supra note 48.
 
 
 [50]
 See, e.g., Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 (3d Cir.1981), aff'd on other grounds, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir.1969)
 
 
 [51]
 Peck v. Jenness, 48 U.S. 612, 624-25, 7 How. 612, 12 L.Ed. 84 (1849)
 
 
 [52]
 See, e.g., 28 U.S.C. Sec. 2283: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (emphasis added). This limitation on the authority of the federal courts to enjoin state courts effectuates the strong policies of comity and mutual respect that limit the discretion of courts to interfere with concurrent proceedings. These policies, which find such compelling expression in ordering the intranational affairs of our dual court system, apply a fortiori to injunctions affecting the exercise of jurisdiction in foreign countries. Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir.1969)
 
 
 [53]
 There is less justification for permitting a second action after a prior court has reached a judgment on the same issues. The parallel proceeding rule applies only until one court reaches a judgment that may be pled as res judicata in the other. Princess Lida of Thurn & Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939)
 
 
 [54]
 See Bethell v. Peace, 441 F.2d 495 (5th Cir.1971); Scott v. Hunt Oil Co., 398 F.2d 810 (5th Cir.1968). Since res judicata and collateral estoppel may be pled in subsequent actions, a showing of harassment, bad faith, or other strong equitable circumstances should ordinarily be required. Cf. Donovan v. Dallas, 377 U.S. 408, 411-12, 84 S.Ct. 1579, 1581-1582, 12 L.Ed.2d 409 (1964) (state court improperly enjoined litigant's suit in federal court after adverse state court judgment since plea of res judicata was for second forum, not first forum, to determine); C. WRIGHT, A. MILLER & E. COOPER, 17 FEDERAL PRACTICE & PROCEDURE Sec. 4226 at 346-50 (1978)
 
 
 [55]
 See, e.g., Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 856 (9th Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); Cargill, Inc. v. Hartford Accid. & Indem. Co., 531 F.Supp. 710, 715 (D.Minn.1982); Medtronic, Inc. v. Catalyst Research Corp., 518 F.Supp. 946 (D.Minn.), aff'd, 664 F.2d 660 (8th Cir.1981)
 
 
 [56]
 Piper Aircraft Co. v. Reyno, 454 U.S. 235, 258-61, 102 S.Ct. 252, 267-268, 70 L.Ed.2d 419 (1981); Pain v. United Technologies Corp., 637 F.2d 775, 786-94 (D.C.Cir.1980)
 
 
 [57]
 Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 (3d Cir.1981), aff'd on other grounds, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). See also Kline v. Burke Const. Co., 260 U.S. 226, 233, 43 S.Ct. 79, 82, 67 L.Ed. 226 (1922); Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970) (where two courts have concurrent jurisdiction neither is ordinarily free to prevent either party from simultaneously pursuing claims in both courts)
 However, where so many actions have been commenced that there is no advantage to be gained from the multiple actions other than harassment and attrition, circumstances may justify an injunction. See Sperry Rand Corp. v. Sunbeam Corp., 285 F.2d 542 (7th Cir.1960) (dissolving an antisuit injunction when the domestic action would not resolve the issues raised in the foreign proceeding and there was no evidence of harassment); Commercial Acetylene Co. v. Avery Portable Lighting Co., 152 F. 642, 647 (E.D.Wis.1906), aff'd, 159 F. 935 (7th Cir.1908) (the court may prevent oppression through multiple suits brought for "commercial advantage rather than honest adjudication"). Even in this situation, deference to the foreign proceedings is still an important factor to be considered. Id. at 647-48 (enjoining commencement of further patent infringement suits against purchasers when one action against manufacturer would resolve the issue of validity of the patent, but requiring the movant to apply for a stay in ten previously filed federal infringement actions instead of enjoining those actions).
 
 
 [58]
 See supra note 55
 
 
 [59]
 Colorado River Water Conservancy Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877, 887 (3d Cir.1981), aff'd on other grounds, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). Cf. C. WRIGHT, A. MILLER & E. COOPER, 17 FEDERAL PRACTICE & PROCEDURE Sec. 4225 at 336 (1978) (The "necessary in aid of its jurisdiction" exception of 28 U.S.C. Sec. 2283 "does not allow a federal court to enjoin state proceedings merely because they "to enjoin state proceedings to protect a judgment that involve issues presented in a federal in personam action."). Similarly, permitting the protection or effectuation of judgments under 28 U.S.C. Sec. 2283 does not allow a federal court to enjoin state proceedings "to protect a judgment that the federal court may make in the future but has not yet made." C. WRIGHT, A. MILLER & E. COOPER, 17 FEDERAL PRACTICE & PROCEDURE Sec. 4226 at 345 (1978)
 
 
 [60]
 See supra note 53
 
 
 [61]
 Tahan v. Hodgson, 662 F.2d 862, 864 (D.C.Cir.1981)
 
 
 [62]
 Id
 
 
 [63]
 For example, the chronological order in which concurrent in personam suits are filed is often cited as a controlling factor. E.g., Gage v. Riverside Trust Co., 86 F. 984 (S.D.Cal.1898). Taken literally, a general rule permitting the earlier filed action to enjoin all subsequent actions would destroy the principle of concurrent jurisdiction. Cf. Compagnie des Bauxites de Guinea v. Insurance Corp. of N. Am., 651 F.2d 877, 887 (3d Cir.1981), aff'd on other grounds, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (injunction refused despite delay of four years in commencing foreign action). However, when substantial time has elapsed between the commencement of the two actions, laches or similar equitable principles make it more appropriate to enjoin the second action. See Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); United Cigarette Mach. Co. v. Wright, 156 F. 244 (E.D.N.C.1907), aff'd, 193 F. 1023 (4th Cir.1912). Cf. Saeman v. Everest & Jennings, Inc., 343 F.Supp. 457, 461-62 (N.D.Ill.1972) (action stayed pending foreign proceeding filed three years earlier)
 
 
 [64]
 See James v. Grand Trunk Western R.R. Co., 14 Ill.2d 356, 152 N.E.2d 858, cert. denied, 358 U.S. 915, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958). Compliance with interlocutory orders may be protected from foreign interference as well. Omnium Lyonnais D'Etancheite et Revetement Asphalte v. Dow Chemical Co., 441 F.Supp. 1385 (C.D.Cal.1977) (enjoining use of discovery materials in foreign proceedings in violation of terms of domestic discovery order)
 
 
 [65]
 See, e.g., Hyafill v. Buffalo Marine Const. Co., 266 F. 553 (W.D.N.Y.1919). Cf. State ex rel., General Dynamics Corp. v. Luten, 566 S.W.2d 452 (Mo.1978) (injunction reversed on grounds, inter alia, that party had not demonstrated that the foreign court could not do full justice)
 
 
 [66]
 See, e.g., High Court Judgment at 568, supra note 10, where Justice Parker stated "it is common ground that if Lakers are allowed to pursue the American action B.A.'s and B.C.'s actions should be stayed or dismissed. They would serve no useful purpose and would merely involve both sides in unnecessary expense."
 
 
 [67]
 Oral Argument Tr. at 17, 19
 
 
 [68]
 See District Court Op., 559 F.Supp. at 1139 n. 63
 
 
 [69]
 Cole v. Cunningham, 133 U.S. 107, 122-23, 10 S.Ct. 269, 274, 33 L.Ed. 538 (1890); Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir.1981); Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578-79 (1st Cir.1969). See also 1A (Part 2) J. MOORE, W. TAGGART, A. VESTAL & J. WICKER, MOORE'S FEDERAL PRACTICE p .204 (1982) ("a court may enjoin a party from pursuing litigation in another court which circumscribes the policy of the forum issuing the injunction")
 
 
 [70]
 See Hilton v. Guyot, 159 U.S. 113, 164-65, 16 S.Ct. 139, 143-44, 40 L.Ed. 95 (1895); Tahan v. Hodgson, 662 F.2d 862, 864 (D.C.Cir.1981); Sangiovanni Hernandez v. Dominicana de Aviacion C. Por A., 556 F.2d 611, 614 (1st Cir.1977); RESTATEMENT (SECOND) OF CONFLICT OF LAWS Sec. 117 Comment c (1971)
 
 
 [71]
 The specific reason for refusing recognition on public policy grounds may vary. In foreign judgment cases, enforcement is denied because the judgment is predicated on laws repugnant to the domestic forum's conception of decency and justice. In the context of antisuit injunctions, deference to the foreign proceeding may be denied because of the litigant's unconscionable evasion of the domestic laws, and not necessarily because of the inherent obnoxiousness of the forum laws to which the litigant has resorted
 
 
 [72]
 "Only in clear-cut cases ought it to avail defendant." Tahan v. Hodgson, 662 F.2d 862, 866 n. 17 (D.C.Cir.1981). See also RESTATEMENT (SECOND) OF CONFLICT OF LAWS Sec. 117 Comment c (1971)
 
 
 [73]
 Courts split when identifying those circumstances in which instituting a foreign proceeding constitutes an enjoinable evasion of forum law and policy. The experience of the state courts, where the principle has been more often applied, gives no clear-cut rule. When the primary purpose of the foreign action is to avoid the regulatory effect of the domestic forum's statutes, then an injunction is more readily issued. See, e.g., Hoover Realty Co. v. American Inst. of Mktg. Syss., Inc., 24 Mich.App. 12, 179 N.W.2d 683 (1970); Sandage v. Studebaker Bros. Mfg. Co., 142 Ind. 148, 41 N.E. 380 (1895). On the other hand, merely seeking a remedy not available in the domestic forum may be proper. Tabor & Co. v. McNall, 30 Ill.App.3d 593, 333 N.E.2d 562 (1975); Lederle v. United Services Auto. Ass'n, 394 S.W.2d 31 (Tex.Civ.App.1965), vacated on other grounds, 400 S.W.2d 749 (Texas 1966) (injunction not ordinarily granted merely to prevent the invocation of more favorable law unless an actual evasion of the substantive law of the domicile will result). The standard of "unfair or unconscionable advantage" is employed by other courts. Keisker v. Bush, 210 Ky. 718, 276 S.W. 815 (1925)
 The only guideline which emerges is the necessity of evaluating the merits of each claim in light of the particular equitable circumstances surrounding the dual litigation. It should be clear that the availability of slight advantages in the substantive or procedural law to be applied in the foreign court does not signify an actionable evasion of domestic public policy. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). An impermissible evasion is much more likely to be found when the party attempts to elude compliance with a statute of specific applicability upon which the party seeking an injunction may have relied, and which is designed to effectuate important state policies.
 
 
 [74]
 United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972)
 
 
 [75]
 The specific terms of this treaty, upon which British Caledonian and British Airways rely to establish their purported immunity from United States antitrust laws, remains unclear. Although the British Government interprets the treaty as conferring immunity, there are no express provisions to this effect. The United States Government has not acceded to this interpretation. Moreover, as the United Kingdom courts recognize, the alleged attempts to interfere with Laker's refinancing arrangements fall outside of the range of tariff setting activities that would be immunized by the Bermuda II Treaty. See Court of Appeal Judgment at 589, supra note 15 (holding that the refinancing allegations could not proceed independently of the other claims on the ground that the refinancing allegations did not state an independent claim, but not that they were immune under the Bermuda II Treaty); High Court Judgment at 566, supra note 10
 
 
 [76]
 Air Transport Agreement Between the Government of the United States of America and the Government of Belgium, 23 Oct. 1980, art. 12, T.I.A.S. No. 9903 [hereinafter cited as United States-Belgium Air Transport Treaty]
 
 
 [77]
 United States-Netherlands Air Transport Treaty at art. 6, 29 U.S.T. at 3095, supra note 38
 
 
 [78]
 United States-Germany Air Transport Treaty at art. 6, 30 U.S.T. at 7334, supra note 38
 
 
 [79]
 E.g., Seattle Totems Hockey Club, Inc. v. National Hockey League, 652 F.2d 852, 855 (9th Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); PPG Industries, Inc. v. Continental Oil Co., 492 S.W.2d 297 (Tex.Civ.App.1973)
 
 
 [80]
 Br. for Appellant Sabena at 15
 
 
 [81]
 Comity teaches that the sweep of the injunction should be no broader than necessary to avoid the harm on which the injunction is predicated. No injunction should be entered at all when less intrusive measures would redress the injury caused by evasion of the public policies. Thus, although our counterparts on the United Kingdom courts may disagree, the English injunctions against Laker cannot be justified as necessary to prevent Laker's evasion of Britain's important public policy of avoiding foreign remedies that could damage British trading interests. The British injunction is not an antisuit injunction designed to protect their jurisdiction to proceed with the case. Rather, its only purpose is to destroy the United States District Court's jurisdiction
 This harsh result is entirely unwarranted. Even though we do not approve of them, the terms of the British Protection of Trading Interests Act authorize postjudgment sanctions, repayment of litigation costs and damages, and even repayment of judgments. In addition, Laker is subject to criminal sanctions and fines if it violates the Act's prohibitions. These powerful mechanisms appear to be more than adequate to protect whatever British economic interests the Secretary of State determines are adversely affected.
 
 
 [82]
 Blanchard v. Commonwealth Oil Co., 294 F.2d 834 (5th Cir.1961)
 
 
 [83]
 Doyle v. Northern Pac. Ry. Co., 55 F.2d 708 (D.Minn.1932). See also British Transport Comm'n v. United States, 354 U.S. 129, 142, 77 S.Ct. 1103, 1110, 1 L.Ed.2d 1234 (1957) ("an injunction against suits being filed in foreign jurisdictions would be ineffective unless comity required its recognition"). Cf. State ex rel. Bossung v. District Court, 140 Minn. 494, 168 N.W. 589 (1918) (lower court's stay of proceeding due to foreign antisuit injunction reversed for abuse of discretion)
 
 
 [84]
 Comity is the usual basis for staying the domestic action due to a foreign antisuit injunction. However, comity does not apply to the appeal of KLM and Sabena. See infra part II. D
 
 
 [85]
 James v. Grand Trunk Western R.R. Co., 14 Ill.2d 356, 152 N.E.2d 858, cert. denied, 358 U.S. 915, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958) (counterinjunction granted). But see Bryant v. Atlantic Coast Line R.R., 92 F.2d 569 (2d Cir.1937) (counterinjunction denied)
 
 
 [86]
 See Pacific Employers Ins. Co. v. Industrial Accid. Comm'n, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939)
 
 
 [87]
 Sabena Br. at 12 (emphasis added)
 
 
 [88]
 Oral Argument Tr. at 14-15
 
 
 [89]
 Br. of Amici Curiae at 12 (footnote omitted)
 
 
 [90]
 See RESTATEMENT (REVISED) Sec. 402 Comment b (Tentative Draft No. 2), supra note 21; RESTATEMENT (SECOND) Sec. 30 Comment b, supra note 20
 
 
 [91]
 RESTATEMENT (SECOND) Sec. 37, supra note 20; id. Sec. 39 Comment b, at 112. In most situations international law does not provide for choosing among competing bases of jurisdiction to prescribe conduct. Id. It follows that no single base is inherently superior to any other, as appellants assert
 
 
 [92]
 RESTATEMENT (SECOND) Sec. 30 Comment c, supra note 20
 
 
 [93]
 See, e.g., RESTATEMENT (SECOND) Sec. 40, supra note 20; RESTATEMENT (REVISED) Sec. 403 (Tentative Draft No. 2), supra note 21
 
 
 [94]
 E.g., Pacific Employers Ins. Co. v. Industrial Accid. Comm'n, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939) (Massachusetts not entitled to exclusive jurisdiction over workers compensation claim of Massachusetts resident-employee); Case of the S.S. "Lotus," (1927) P.C.I.J., Ser.A., No. 10 at 18, 2 M. Hudson, World Court Reports 20 (France not entitled to exclusive jurisdiction over prosecution of allegedly negligent French vessel operator)
 
 
 [95]
 See Br. of Appellant Sabena at 16 n. 1
 
 
 [96]
 See Davidow, Extraterritorial Antitrust and the Concept of Comity, 15 J. WORLD TRADE L. 500, 508 (1981)
 
 
 [97]
 District Court Op., 559 F.Supp. at 1132
 
 
 [98]
 Davidow, Extraterritorial Antitrust and the Concept of Comity, 15 J. WORLD TRADE L. 500, 508 (1981)
 
 
 [99]
 P. BLUMBERG, THE LAW OF CORPORATE GROUPS Sec. 20.02 (1983)
 
 
 [100]
 United States-Belgium Air Transport Treaty at art. 11(2), supra note 76
 
 
 [101]
 See United States-Netherlands Air Transport Treaty at arts. 5, 6, 29 U.S.T. at 3094-95, supra note 38
 
 
 [102]
 See Hilton v. Guyot, 159 U.S. 113, 164-65, 16 S.Ct. 139, 143-144, 40 L.Ed. 95 (1895)
 
 
 [103]
 See Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law, 76 AM.J.INT'L L. 280, 283 (1982)
 
 
 [104]
 See Hilton v. Guyot, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895); Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law, 76 AM.J.INT'L 280, 282 (1982) (quoting U. HUBER, DE CONFLICTU LEGUM). In his classic COMMENTARIES ON THE CONFLICT OF LAWS 30, 32-33 (1834) (Arno Press ed. 1972), Joseph Story also recognized that foreign laws ought to be given force in domestic forums only "so far as they do not prejudice the power or right of other governments, or of their citizens." This principle, he stated,
 seems irresistibly to flow from the right and duty of every nation to protect its own subjects against injuries resulting from the unjust and prejudicial influence of foreign laws; and to refuse its aid to carry into effect any foreign laws, which are repugnant to its own interests and polity.
 It is difficult to conceive, upon what ground a claim can be rested, to give any municipal laws an extraterritorial effect, when those laws are prejudicial to the rights of other nations, or their subjects. It would at once annihilate the sovereignty and equality of the nations, which should be called upon to recognise and enforce them; or compel them to desert their own proper interest and duty in favour of strangers, who were regardless of both. A claim, so naked of principle and authority to support it, is wholly inadmissible.
 See also id. at 37.
 
 
 [105]
 E.g., Tahan v. Hodgson, 662 F.2d 862, 864, 866 (D.C.Cir.1981); Clarkson Co., Ltd. v. Shaheen, 544 F.2d 624, 629 (2d Cir.1976); Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir.), cert. denied, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1971); Kenner Prods. Co. v. Societe Fonciere et Financiere Agache-Willot, 532 F.Supp. 478, 479; Sumitomo Corp. v. Parakopi Compania Maratima, S.A., 477 F.Supp. 737, 742 (S.D.N.Y.1979), aff'd, 620 F.2d 286 (2d Cir.1980); Duplan Corp. v. Deering Milliken, Inc., 397 F.Supp. 1146 (D.S.C.1975)
 
 
 [106]
 Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 404 F.2d 804, 814 n. 31 (D.C.Cir.1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969) (principles of comity are appropriately considered when construing antitrust laws)
 
 
 [107]
 See National Bank of Canada v. Interbank Card Ass'n, 666 F.2d 6, 8 (2d Cir.1981)
 
 
 [108]
 See, e.g., Lauritzen v. Larsen, 345 U.S. 571, 582-83, 592-93, 73 S.Ct. 921, 933, 97 L.Ed. 1254 (1953); United States v. Aluminum Co. of Am., 148 F.2d 416, 443 (2d Cir.1945)
 
 
 [109]
 In this case, the injuries alleged in Laker's complaints are clearly within the scope of the antitrust laws; the interests at stake in Laker's action here are primarily those of United States consumers and lenders; and Congress has expressly allowed foreign corporations to sue for violations of the Sherman and Clayton Acts. See Pfizer Inc. v. India, 434 U.S. 308, 312, 98 S.Ct. 584, 587, 54 L.Ed.2d 563 n. 9 (1978). Regulation of the appellants' conduct is entirely consistent with their treaty obligations to conduct business here without participating in predatory or discriminatory pricing practices. Thus, "it is the Sherman Act's applicability, rather than its inapplicability, that is supported by consideration of the 'comity' factors." Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 404 F.2d 804, 814 n. 31 (D.C.Cir.1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969)
 
 
 [110]
 A defendant's claims that foreign law forbids a foreign national from prosecuting a United States antitrust action should be made initially in the United States District Court free from the coercive threat of a possible antisuit injunction. If justified by principles of comity or the lack of sufficient implication of United States interests, that claim could be granted. In making such a ruling the district court would not necessarily be required to resolve unsettled questions of foreign law, such as whether the foreign plaintiff would violate foreign law by suing under United States antitrust claims, since the district court would have discretion to stay the action pending a special proceeding in the foreign court brought for the limited purpose of resolving that issue, if the status of the foreign law were unclear. See Lehman Bros. v. Schein, 416 U.S. 386, 389-91, 94 S.Ct. 1741, 1743-44, 40 L.Ed.2d 215 (1974). Cf. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (federal district court properly stayed federal proceedings pending the initiation and resolution of a state court action to construe an uninterpreted state statute)
 
 
 [111]
 See, e.g., Pacific Employers Ins. Co. v. Industrial Accid. Comm'n, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939); James v. Grand Trunk Western R.R. Co., 14 Ill.2d 356, 152 N.E.2d 858, cert. denied, 358 U.S. 915, 79 S.Ct. 288, 3 L.Ed.2d 239 (1958)
 
 
 [112]
 Tahan v. Hodgson, 662 F.2d 862, 864, 867-68 (D.C.Cir.1981)
 
 
 [113]
 See App. Tab 6, supra note 10
 
 
 [114]
 Id.; Protection of Trading Interests Act Sec. 1, supra note 4
 
 
 [115]
 App. Tab 6, supra note 10 (emphasis added)
 
 
 [116]
 Letter from Peter J. Nickels to Clerk George A. Fisher, with attachment (5 Jan. 1984); letter from Carl W. Schwartz to Clerk George A. Fisher, with attachments (12 Jan. 1984) (see letters from Durrant Piesse to R.J. Ayling, Esq., of The Solicitor's Office, Dept. of Trade and Industry (20 Sept. 1983, 3 Oct. 1983, 16 Nov. 1983, 12 Dec. 1983) [requesting permission to use commercial information in responding to interrogatories served by TWA]; letters from R.J. Ayling to Durrant Piesse (21 Oct. 1983, 9 Dec. 1983, 15 Dec. 1983) [denying permission based on interpretation by the Secretary of State of the order and directions]. Apparently Laker argued to the Secretary of State that the order and directions do not bar Laker from producing documents located in the United States and should therefore not be interpreted to prevent Laker from answering interrogatories based on information contained in those documents. The Secretary of State interpreted the order and directions literally, concluding that Laker's answers to interrogatories may not disclose commercial information regardless of whether the information was derived from documents that could be produced. Id
 
 
 [117]
 A grand jury investigation may be pending. We are uninformed as to its current status
 
 
 [118]
 Oral Argument Tr. at 26-37. As a general rule, the stockholders and creditors of corporations injured by antitrust violations do not have standing to vindicate the injury. However, this rule is based on the fact that the direct victim of the injury--the corporation--is ordinarily capable of protecting the creditors' private interest and the public's general interest in effective antitrust enforcement. P. AREEDA & D. TURNER, II Antitrust Law Sec. 336(c) (1978). As in any derivative action, the case for creditor or stockholder standing would be stronger when the corporation could not enforce its own rights. See, e.g., Loeb v. Eastman Kodak Co., 183 F. 704, 709 (3d Cir.1910) (denying standing to a creditor of a bankrupt corporation, but stating a creditor should be permitted to sue in the name of the bankruptcy trustee if the latter were barred). In view of our disposition of this case, we need not decide whether Laker's American creditors would have standing to redress Laker's alleged antitrust injuries
 
 
 [119]
 For example, the directions issued pursuant to the order state in the broadest possible terms that Laker shall not "comply, or cause or permit compliance, whether by themselves, their officers, servants or agents, with any requirement to produce or furnish to the United States' Department of Justice, the grand jury or the District Court any document in the United Kingdom or any commercial information which relates to the said Department of Justice investigation or the grand jury or District Court proceedings." See App. Tab 6, supra note 10
 
 
 [120]
 See J. WATSON, THE PHILOSOPHY OF KANT 230-31 (1901)
 
 
 [121]
 Of course, the British government does not intend to invoke the Protection of Trading Interests Act to bar all jurisdiction exercised by United States courts over foreign airlines--just that necessary to provide a forum for the enforcement of American antitrust laws. This illustrates that the conflict here is between deeply felt and long held economic and political policies of both the United States and the British governments, and that the courts of the respective jurisdictions are in no position to resolve that dispute by conceding comity to the decrees of the other. The comity we are asked to invoke is thus comity for the British Executive--and that is something better left to the American Executive to negotiate. Conceding comity to the actions of the British courts, which were brought about and directed rather specifically by the actions of the British Executive, and whose sole purpose is the unilateral subjugation of United States interests to those of Great Britain, would require the American judges to abdicate their oath of office to uphold the laws of the United States. This we cannot conscientiously do, however much we understand and respect the position that our English judicial peers are in. See infra parts II. F. 1 and II. F. 3
 
 
 [122]
 Sabena has suggested that the alleged conspiracies may implicate the involvement of several British governmental authorities, including the Department of Trade, Civil Aviation Authority, and Bank of England. Br. of Appellant Sabena at 9
 
 
 [123]
 See generally, J. ATWOOD & K. BREWSTER, 1 ANTITRUST AND AMERICAN BUSINESS ABROAD Secs. 8.02, 8.12-8.14 (1981) (discussing applicability of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); Noerr/Pennington doctrine; and defense of foreign governmental compulsion)
 
 
 [124]
 District Court Op., 559 F.Supp. at 1139 n. 63. See also Cargill v. Hartford Acc'd & Indem. Co., 531 F.Supp. 710, 715 (D.Minn.1982) (refusing to enjoin commencement of suits not directly related to the domestic proceedings); Medtronic, Inc. v. Catalyst Research Corp., 518 F.Supp. 946, 954, 957 (D.Minn.), aff'd, 664 F.2d 660 (8th Cir.1981) (limiting injunction to bar only foreign injunctive relief, but permitting continuation of foreign damage actions based on same claim)
 
 
 [125]
 Dissent Op. at 6
 
 
 [126]
 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895) (emphasis added)
 
 
 [127]
 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)
 
 
 [128]
 See infra note 177
 
 
 [129]
 Dissent Op. at 958
 
 
 [130]
 Id. at 958
 
 
 [131]
 Id. at 958
 
 
 [132]
 See supra note 110
 
 
 [133]
 See App. Tab 2, supra note 10
 
 
 [134]
 Pfizer Inc. v. India, 434 U.S. 308, 314, 98 S.Ct. 584, 588, 54 L.Ed.2d 563 (1978)
 
 
 [135]
 See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981-1984, 20 L.Ed.2d 982 (1968); Westinghouse Electric Corp. v. City of Burlington, 351 F.2d 762, 770 (D.C.Cir.1965); P. AREEDA & D. TURNER, II ANTITRUST LAW Sec. 331 at 149-150 (1978)
 
 
 [136]
 148 F.2d 416 (2d Cir.1945)
 
 
 [137]
 See The Foreign Trade Antitrust Improvements Act of 1982, 96 Stat. 1246, 15 U.S.C.A. Secs. 6a, 45(a)(3) (1982). In passing this Act, which clarifies the applicability of United States antitrust laws to export trade, Congress did not change either (1) the ability of the courts to exercise comity or otherwise recognize the peculiar problems associated with antitrust actions involving international transactions, or (2) the application of antitrust laws to conduct producing the requisite effect in United States territory. See Foreign Trade Antitrust Improvements Act of 1982, 97th Cong., 2d Sess., H. REP. 686 at 13 (1982)
 
 
 [138]
 Although we take issue with the combative, intrusive method of frustrating United States jurisdiction through which the British Executive has exported these policies, contrary to the implications of the dissent we do not find the British views to be inherently distasteful or unreasonable. Dissent Op. at 957
 We reject any suggestion that the standard of justice under British antitrust laws, which provide only for single damages, is inferior to the treble damage provisions of United States laws. Both sets of laws are designed to provide full justice to litigants, although the particular form and availability of remedies differs somewhat due to the divergent legislative intent behind the laws. We are not asked and do not purport to pass judgment on the British attitude, but only resolve the extent of the United States District Court's discretion to execute its duty of upholding United States laws in the instant circumstances.
 
 
 [139]
 Court of Appeal Judgment at 574, supra note 15. Thus, the Court of Appeal found it unnecessary to consider the correctness of the judgment of the High Court of Justice. Id
 
 
 [140]
 Id. at 584
 
 
 [141]
 Id. at 591. It is not at all clear to us that the English courts were bound to uphold the Secretary's orders under the reasoning relied upon. We are not informed as to the exact scope of the English courts' authority to review actions of the executive for conformity to treaties or other governing law. Consequently we would never criticize or second guess the decision of the Court of Appeals to affirm the Secretary's order. However, it does not necessarily follow from the obligation of the English court to sustain its Executive that the English court must consider that the two British defendants would be unjustly treated in the American courts because they were unable to make a proper defense, since their production of documents has been by the British Executive order, not by any American act. If, because of their handicap in proof, these two defendants ultimately were to be unjustly treated in the American courts, then the complaint of injustice should be frankly made by the British court to its own Executive, which is solely responsible for creating the British defendants' disability. Although it sustained the validity of the order and directions issued by the British Executive, the court was free to point out that the problem of the two British defendants arose because of the act of the British Executive in denying them access to their defensive proof, not because of any violation of due process or injustice created by this particular American court or the American court system. Nor should it be presumed that the American court would be oblivious to the handicap imposed on the British defendants, if such exists, or powerless to take procedural steps to equalize matters
 Neither is it immediately apparent why the English injunction is necessary to protect the British defendants from suffering injustice in the United States courts. The orders apparently apply equally to Laker, preventing it from furnishing documents in the United Kingdom or any commercial information relating to the district court proceedings. As the Secretary of State's refusal to permit Laker to use commercial information in response to interrogatories served by the American defendants demonstrates, Laker is severely hampered in the advancement of its claims. The British parties appear to be on an equal footing.
 If there is any injustice created in the proceedings, it is between Laker and the American defendants. The order and directions have been interpreted to bar only Laker's production of documents and commercial information--the United States airlines are untouched. These defendants are free to assert defenses, make discovery requests against Laker, and seek penalties for non-compliance. Laker responds only at the risk of incurring British sanctions under the order and directions. The order and directions thus leave one group of parties--the American defendants--free to conduct their litigation--while hampering the other party--the plaintiff. See also Reply of Amici Curiae to Appellee's Memorandum as to Status of English Proceedings at 4: ("Lufthansa and Swissair are advised, however, that the Directions do prevent U.K. nationals [e.g. Laker ] ... from complying with discovery demands by parties to the U.S. action (including Lufthansa and Swissair )." (emphasis added). This is an impairment to justice as objectionable as that complained of by the Court of Appeal.
 We also note that the Court of Appeal may have temporarily lapsed from its resolve not to speculate about the merits of Laker's antitrust claims under United States law when, to justify its conclusion that Laker's entire claim arose out of conduct related to the Bermuda II Treaty, the court concluded that the alleged impedance of the financial rescue operation was such an insignificant aspect of the alleged conspiracy that this assertion alone could not state a cognizable antitrust claim. Court of Appeal Judgment at 589, supra note 15. We raise these points not to suggest that the Court of Appeal's decision was wrongly decided under English law, but only to demonstrate the extreme degree of deference which that court felt obliged to grant to the legislative policies implemented in the Secretary of State's order and directions.
 
 
 [142]
 British Airways Board v. Laker Airways Ltd. & Others (Judgment of 30 March 1983) at 7, reproduced at App. Tab 4, supra note 10
 
 
 [143]
 See, e.g., RESTATEMENT (REVISED) Sec. 403 (Tentative Draft No. 2), supra note 21
 
 
 [144]
 See Natural Resources Defense Council v. Nuclear Regulatory Comm'n, 647 F.2d 1345, 1357 (D.C.Cir.1981): "Some balancing, or recognition of latent conflict of laws, would seem judicious to reconcile the separate but not inconsistent national interests ...." (emphasis respectively added and original)
 
 
 [145]
 R ESTATEMENT (R EVISED) Sec. 403(2)(a), (b) (Tentative Draft No. 2), supra note 21. See also Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 614 (9th Cir.1976) ("relative significance of effects in the United States;" "the extent to which there is explicit purpose to harm or affect American commerce;" "the foreseeability of such effect;" "the relative importance to the violations charged of conduct within the United States as compared with conduct abroad;" nationality or principal business locations of the parties); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1297 (3d Cir.1979) ("Nationality of the parties," "Existence of intent to harm or affect American commerce and its forseeability")
 
 
 [146]
 RESTATEMENT (REVISED) Sec. 403(a)(g), (h) (Tentative Draft No. 2), supra note 21. See also Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 614 (9th Cir.1976) ("degree of conflict with foreign law or policy"); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1297 (3d Cir.1979) (same)
 
 
 [147]
 RESTATEMENT (REVISED) Sec. 403(2)(c) (Tentative Draft No. 2), supra note 21
 
 
 [148]
 See Picciotto, Jurisdictional Conflicts, International Law and the International State System, 11 INT'L J. SOC.L. 11, 23-26 (1983); Davidow, Extraterritorial Antitrust and the Concept of Comity, 15 J. WORLD TRADE L. 500, 500-02 (1981); Rahl, International Application of American Antitrust Laws: Issues and Proposals, 2 N.Y.J. INT'L & BUS. 336, 340-41 (1980)
 
 
 [149]
 RESTATEMENT (REVISED) at Sec. 403(2)(d) (Tentative Draft No. 2), supra note 21 (emphasis added)
 
 
 [150]
 Id. Sec. 403(2)(c)
 
 
 [151]
 In Re Uranium Antitrust Litigation, 480 F.Supp. 1138, 1148 (N.D.Ill.1978)
 
 
 [152]
 Id. We note that under the Tentative Drafts of the RESTATEMENT (REVISED) the reasonableness balancing could easily be circumvented. Section 415(2) permits the assertion of jurisdiction without a specific examination into reasonableness under Sec. 403(2) and (3) when there was a "principal purpose" to affect United States commerce. Compare Sec. 415(2) with Sec. 415(3). Since a principal purpose is often found whenever there are effects on United States commerce, the reasonableness text of Sec. 403(2) will often be superfluous
 
 
 [153]
 National Bank of Canada v. Interbank Card Ass'n, 666 F.2d 6 (2d Cir.1981); In re Uranium Antitrust Litigation, 617 F.2d 1248 (7th Cir.1980)
 
 
 [154]
 See, e.g., Maier, Interest Balancing and Extraterritorial Jurisdiction, 31 AM.J.COMP.L. 579 (1983); Grippando, Declining to Exercise Extraterritorial Antitrust Jurisdiction on Grounds of International Comity: An Illegitimate Extension of the Judicial Abstention Doctrine, 23 VA.J.INT'L L. 395 (1983); Kadish, Comity and the International Application of the Sherman Act: Encouraging Courts to Enter the Political Arena, 4 N.W.J.INT'L L. & BUS. 130 (1982); Rahl, International Application of American Antitrust Laws: Issues and Proposals, 2 N.W.J.INT'L & BUS. 336, 362-64 (1980). Cf. Juenger, Conflict of Laws: A Critique of Interest Analysis, 32 AM.J.COMP.L. 1 (1984)
 
 
 [155]
 Congress is presumed to legislate within the constraints of international law, unless it expressly manifests a contrary intent. Natural Resources Defense Council v. Nuclear Regulatory Comm'n, 647 F.2d 1345, 1357 (D.C.Cir.1981); Federal Trade Comm'n v. Compagnie de Saint-Gobain-Pont-a-Mousson, 636 F.2d 1300, 1315, 1323 (D.C.Cir.1980); RESTATEMENT (REVISED) Sec. 134 (Tentative Draft No. 1) (1980), supra note 21; RESTATEMENT (SECOND) Sec. 3(3), supra note 20
 
 
 [156]
 See, e.g., Montreal Trading Ltd. v. Amax, Inc., 661 F.2d 864, 870 (10th Cir.1981), cert. denied, 455 U.S. 1001, 102 S.Ct. 1634, 71 L.Ed.2d 868 (1982) (effects were so "speculative and insubstantial" that "neither the Constitution nor the Sherman Act was intended" to reach the challenged conduct); Vespa of Am. Corp. v. Bajaj Auto Ltd., 550 F.Supp. 224, 229 (N.D.Cal.1982) (no effects); Conservation Council of W. Australia v. Aluminum Co. of Am., 518 F.Supp. 270 (W.D.Pa.1981) (no effects). Where there are only insubstantial or nonexistent effects on United States commerce, no interest balancing is necessary to conclude that jurisdiction does not exist. Indeed, application of interest balancing may obscure an accurate evaluation of the alleged effects resulting in an unwarranted extension of jurisdiction. See National Bank of Canada v. Interbank Card Ass'n, 507 F.Supp. 1113 (S.D.N.Y.1980) (applying interest balancing and concluding that jurisdiction should be exercised), reversed, 666 F.2d 6 (2d Cir.1981) (alleged effects were not sufficiently anticompetitive to come within purview of antitrust laws; no need to balance interests)
 
 
 [157]
 See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406 (9th Cir.1977); Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir.1976); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287 (3d Cir.1979)
 
 
 [158]
 See Industrial Development Corp. v. Mitsui & Co., 671 F.2d 876, 884-85 (5th Cir.1982), vacated on other grounds, --- U.S. ----, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983) (applying interest balancing to conclude that lower court erred in dismissing on jurisdictional grounds); United States v. Vetco, Inc., 691 F.2d 1281 (9th Cir.), cert. denied, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); Daishowa Int'l v. North Coast Export Co., 1982-2 Trade Cas. p 64,774 (N.D.Cal.1982). This result has been predicted. See Davidow, Extra-territorial Antitrust and the Concept of Comity, 15 J. WORLD TRADE L. 500,513 (1981)
 
 
 [159]
 Of course, international law forms a part of United States laws, and is enforced in United States courts. See, e.g., The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); RESTATEMENT (REVISED) Sec. 131, supra note 18
 
 
 [160]
 See J. SWEENEY, C. OLIVER & N. LEECH, THE INTERNATIONAL LEGAL SYSTEM 14-23 (1981)
 
 
 [161]
 See Maier, Interest Balancing and Extraterritorial Jurisdiction, 31 AM.J.COMP.L. 579, 593-95 (1983)
 
 
 [162]
 "[I]n the conflict of laws it must often be a matter of doubt which should prevail; ... whenever a doubt does exist, the court, which decides, will prefer the laws of its own country to that of the stranger." Hilton v. Guyot, 159 U.S. 113, 165, 16 S.Ct. 139, 144, 40 L.Ed. 95 (1895)
 
 
 [163]
 Recognition of this fact in no way derogates from the status of international law, since in questions of conflict between the substantive goals of nations asserting concurrent jurisdiction to prescribe international law is generally neutral. See RESTATEMENT (SECOND) Sec. 39 Comment b, supra note 20
 
 
 [164]
 Maier, Interest Balancing and Extraterritorial Jurisdiction, 31 AM.J.COMP.L. 579, 584-85 (1983)
 
 
 [165]
 See RESTATEMENT (REVISED) Sec. 403(1) (Tentative Draft No. 2), supra note 21. Compare RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS Sec. 9 (1971): "A court may not apply the local law of its own state to determine a particular issue unless such application of this law would be reasonable in the light of the relationship of the state and of other states to the person, thing or occurrence involved."
 
 
 [166]
 See M. WHITEMAN, 5 DIGEST OF INTERNATIONAL LAW 218-19 (1965)
 
 
 [167]
 Picciotto, Jurisdictional Conflicts, International Law and the International State System, 11 INT'L J.SOC.L. 11, 14, 25 (1983)
 
 
 [168]
 Of course, there is no requirement that the forum with jurisdiction exercise it to the fullest extent possible. RESTATEMENT (SECOND) Sec. 40, supra note 20
 
 
 [169]
 An interest evaluation conducted through the balancing of competing interests can only function as an effective method of choosing between potential forums to the extent the less reasonable assertion is characterized as "unreasonable." Thus, Section 403(2) of the RESTATEMENT (REVISED) (Tentative Draft No. 2) appears to deny the existence or even the theoretical necessity of concurrent prescriptive jurisdiction
 However, read narrowly, Section 403 does not require this result. The terms of Section 403(1) suggest that an evaluation of interests is essential in determining whether there are sufficient ("reasonable") national contacts with the underlying transaction to allocate prescriptive jurisdiction to a forum. This examination of the reasonableness of the domestic forum's contacts, without explicitly balancing the weight of other foreign contracts, satisfies the prohibition of international law against unreasonable assertions of prescriptive jurisdiction. See also RESTATEMENT (REVISED) Sec. 441 (Tentative Draft No. 2), supra note 21 (defining jurisdiction to adjudicate on the basis of reasonableness without referring to or balancing the reasonableness of a second forum's adjudicatory contacts).
 Because Congress and the Executive can neither anticipate nor resolve all conflicts with foreign prescriptive jurisdiction, they legitimately expect the full participation of the Judiciary in minimizing conflicts of jurisdiction. See "Extraterritoriality and Conflicts of Jurisdiction," U.S. Department of State Current Policy Bulletin No. 481 at 4 (15 April 1983). Evaluating the strength of the United States interests in a particular transaction to determine the reasonableness of an assertion of jurisdiction is consistent with those expectations and assures that concurrent jurisdiction will never be lightly assumed.
 
 
 [170]
 See Cory v. White, 457 U.S. 85, 89, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982); Pacific Employers Ins. Co. v. Industrial Accident Comm'n, 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939); Texas v. Florida, 306 U.S. 398, 410, 59 S.Ct. 563, 569, 83 L.Ed. 817 (1938); Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226 (1922)
 
 
 [171]
 In some contexts, the Due Process Clause serves this function in the state and federal courts of the United States. E.g., Texas v. New Jersey, 379 U.S. 674, 678, 85 S.Ct. 626, 628, 13 L.Ed.2d 596 (1965); Hartford Accid. & Indem. Co. v. Delta Pine & Land Co., 292 U.S. 143, 149, 54 S.Ct. 634, 636, 78 L.Ed. 1178 (1934)
 The actions of the British Government in this case indicate that Britain regards the Bermuda II Treaty as just such an interforum agreement, dislocating the application of the antitrust laws from the conduct challenged in Laker's complaint. However, since a dispute exists between the two governments, we can only assume that the United States Executive Branch does not interpret the agreement to confer an antitrust exemption on United Kingdom air carriers.
 
 
 [172]
 See, e.g., RESTATEMENT (REVISED) Secs. 412, 413 (Tentative Draft No. 2) supra note 21; RESTATEMENT (SECOND) Sec. 37 Reporters' Note 1, supra note 20
 
 
 [173]
 It may be that a rule of law should be developed allocating exclusive prescriptive jurisdiction to the forum with the most significant nexus to the underlying conduct. Given the inherent difficulty of administering an interest balancing formula, it is doubtful that a rule of exclusive jurisdiction based on a common conception of reasonableness will be developed by national courts. The current litigation underscores this point: in the decades since the United States began applying its antitrust laws to overseas conduct substantially affecting its territorial interests, neither the United States' nor United Kingdom's courts have accepted the other courts' definition of the legitimate scope of prescriptive jurisdiction in the antitrust area. It is to be hoped that the political branches of government will eventually negotiate practical solutions, such as those undergirding the area of international taxation, which, through their reciprocal ordering of national regulation, render academic the issue of whether a country would otherwise have the sovereign right to exert its authority in a particular manner
 
 
 [174]
 See RESTATEMENT (REVISED) Sec. 135(2) (Tentative Draft No. 1) (1980), supra note 20; J. SWEENEY, C. OLIVER, N. LEECH, THE INTERNATIONAL LEGAL SYSTEM 22 (1981)
 
 
 [175]
 We disagree with the dissenting opinion precisely because it comes to rest at this untenable position. The "dissent" actually agrees with much of this opinion: it recognizes the legitimacy of the jurisdictional base to Laker's suit; it confirms the authority of the district court to issue a protective injunction; and it would not preclude the district court from issuing a more limited injunction on remand. It is only the "form" of the injunction drafted by the district court which the dissent finds so objectionable that reversal is advocated
 The dissent reaches this conclusion under the guise of "comity." However, the legal basis for this interpretation of comity is nonexistent. See supra pp. 942-944. Comity would be a more significant factor if the two appealing parties were British corporations, but they are not. KLM and Sabena are Dutch and Belgian entities. They are attempting to use the law and courts of a third country, Britain, to frustrate a previously commenced action in the United States. KLM and Sabena have made no request to resort to their own courts in reliance on their own air service agreements or relevant domestic legislation (e.g., Law of 27 March 1969, as Amended on 21 June 1976, and Royal Decree of 6 February 1979 Concerning the Regulation of Marine and Air Transport, at Bulletin Usuel des Lois et Arretes, 1969, No. 723; id., 10 September 1976, No. 1490, id., 1979, No. 464). We can only assume that they do not intend to do so.
 The real motivation for the dissent's position is the desire to avoid further conflict with the laws of our close friends and allies about the application of domestic United States law. This is apparent from the dissent's concern that an affirmance of the injunction would be regarded as "parochial," and from its charge that the injunction obstructs the functioning of our two countries' judicial system.
 We share the same concerns. However, a reversal would not restore the "orderly operation" of our two nation's courts. Instead, it could permit one court entirely to shut down its autonomous sister courts. This certainly does not seem likely to foster parallel respect.
 Moreover, the existence of conflict alone does not establish the judicial prerogative to relinquish prescriptive jurisdiction. Any legitimate assertion of prescriptive jurisdiction seeks to advance the national interests undergirding the jurisdiction; an assertion of that prescriptive power in an area of concurrent jurisdiction may give rise to allegations of parochialism. Protecting the prescriptive jurisdiction of the United States, which the dissent admits is legitimate, can hardly be more "parochial" than the British attempts to destroy that jurisdiction by knowingly issuing interdictory prohibitions and orders, worldwide in scope, after the United States District Court was fully seized of jurisdiction and well on its way in the treatment of Laker's antitrust suit.
 Finally, we must remember that it is American statutory law which is challenged, not law made by the courts. These antitrust laws date back nearly one hundred years, when Congress began legislating to advance competition and consumer well-being in the United States. Up to now, the courts and the Executive have had no choice but to follow the mandate of Congress. Critics concerned with parochialism should direct those attacks to that Branch, not to the Judiciary.
 
 
 [176]
 See, Maier, Interest Balancing and Extraterritorial Jurisdiction, 31 AM.J.COMP.L. 579, 584-85 (1983). Although this process may always be necessary on an ad hoc basis in response to specific suits, anticipatory arrangements could go far in avoiding the problems we are confronted with today. E.g., Agreement Relating to Cooperation on Antitrust Matters, U.S.-Australia, 29 June 1982, T.I.A.S. No. 10365, reprinted at 43 Antitrust & Trade Reg.Rep. (BNA), No. 1071, at 36 (1 July 1982)
 
 
 [177]
 In this case the Bermuda II Treaty calls for negotiation and arbitration of disputes regarding its terms. Bermuda II Treaty, art. 17, 28 U.S.T. 5382-83, supra note 3. Although some consultations may have occurred regarding the problems associated with the litigation and counterlitigation now pressed in the United States and United Kingdom, apparently neither government has yet invoked its right to call for an arbitrated resolution of the scope of the Bermuda II Treaty's immunization from United States antitrust laws. It may be that further efforts by the governments of both countries could help resolve the deadlock which appears to be developing to the detriment of the litigants' interests and the ultimate frustration of the national policies of the United States and Great Britain
 
 
 [178]
 If the United States Executive interpreted the Bermuda II Treaty to waive both the obligation of United Kingdom air carriers to comply with antitrust laws, and the right of those carriers to rely on the protection of those laws, then Laker's claim against the foreign airlines would probably fail. Of course, if only the British airlines' duty of compliance were ceded by the treaty, then nothing would prevent Laker from continuing its suit against KLM and Sabena
 
 
 [1]
 Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir.1969)
 
 
 [2]
 It is far from clear to me that a refusal by the District Court to grant the injunctive relief requested by Laker as to the foreign defendants would have sounded the death knell of Laker's antitrust action, inasmuch as the American defendants would remain before the court in any event
 
 
 [3]
 Evidencing comparable concern for principles of comity, the court in Medtronic, Inc. v. Catalyst Research Corp., 518 F.Supp. 946 (D.Minn.1981), aff'd 664 F.2d 660 (8th Cir.1981), granted a narrow injunction preventing defendant from seeking an injunction against plaintiff's continued manufacture of a product which was the subject of a patent suit. The court specifically noted that the relief would "in no way interfere with" defendant's foreign patent infringement and validity actions in foreign courts
 
 
 [4]
 The possible usefulness of Executive guidance in this matter has appropriately been recognized by the district court. On November 17, 1983, Judge Greene appointed amicus curiae in this case to "assist the Court in determining what action by the Court is required or appropriate in light of the decisions of the English authorities ...." Judge Greene suggested, among other things, that amicus "consider what relationship, if any, should be established with the Department of Justice or the Department of State to enlist their cooperation or assistance."